# PENRY *v.* LYNAUGH, DIRECTOR, TEXAS DEPART-
# MENT OF CORRECTIONS

No. 87–6177.   Argued January 11, 1989—Decided June 26, 1989

304

O'CONNOR, J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Parts I and IV–A, the opinion of the Court with respect to Parts II–B and III, in which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, the opinion of the Court with respect to Parts II–A and IV–B, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Part IV–C. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 341. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BLACKMUN, J., joined, *post*, p. 349. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and KENNEDY, JJ., joined, *post*, p. 350.

*Curtis C. Mason* argued the cause and filed briefs for petitioner.

*Charles A. Palmer*, Assistant Attorney General of Texas, argued the cause for respondent. With him on the briefs were *Jim Mattox*, Attorney General, *Mary F. Keller*, First Assistant Attorney General, *Lou McCreary*, Executive As-

sistant Attorney General, and *Michael P. Hodge* and *William C. Zapalac*, Assistant Attorneys General.*

JUSTICE O'CONNOR delivered the opinion of the Court, except as to Part IV-C.

In this case, we must decide whether petitioner, Johnny Paul Penry, was sentenced to death in violation of the Eighth Amendment because the jury was not instructed that it could consider and give effect to his mitigating evidence in imposing its sentence. We must also decide whether the Eighth Amendment categorically prohibits Penry's execution because he is mentally retarded.

I

On the morning of October 25, 1979, Pamela Carpenter was brutally raped, beaten, and stabbed with a pair of scissors in her home in Livingston, Texas. She died a few hours later in the course of emergency treatment. Before she died, she described her assailant. Her description led two local sheriff's deputies to suspect Penry, who had recently been released on parole after conviction on another rape charge. Penry subsequently gave two statements confessing to the crime and was charged with capital murder.

At a competency hearing held before trial, a clinical psychologist, Dr. Jerome Brown, testified that Penry was mentally retarded. As a child, Penry was diagnosed as having organic brain damage, which was probably caused by trauma to the brain at birth. App. 34-35. Penry was tested over the years as having an IQ between 50 and 63, which indicates

---

*Briefs of *amici curiae* urging reversal were filed for the American Association on Mental Retardation et al. by *James W. Ellis, Ruth Luckasson, Barbara Bergman,* and *Donald N. Bersoff;* for the Texas Criminal Defense Lawyers Association by *David Botsford, Mark Stevens,* and *Carolyn Garcia;* and for Billy Conn Gardner by *Eugene O. Duffy* and *Christine M. Wiseman.*

*Stanley G. Schneider* filed a brief for the Harris County Criminal Lawyers Association as *amicus curiae.*

mild to moderate retardation.[1]  *Id.*, at 36–38, 55.  Dr. Brown's own testing before the trial indicated that Penry had an IQ of 54.  Dr. Brown's evaluation also revealed that Penry, who was 22 years old at the time of the crime, had the mental age of a 6½-year-old, which means that "he has the ability to learn and the learning or the knowledge of the average 6½ year old kid."  *Id.*, at 41.  Penry's social maturity, or ability to function in the world, was that of a 9- or 10-year-old.  Dr. Brown testified that "there's a point at which anyone with [Penry's] IQ is always incompetent, but, you know, this man is more in the borderline range."  *Id.*, at 47.

The jury found Penry competent to stand trial.  *Id.*, at 20–24.  The guilt-innocence phase of the trial began on March 24, 1980.  The trial court determined that Penry's confessions were voluntary, and they were introduced into evidence.  At trial, Penry raised an insanity defense and presented the testimony of a psychiatrist, Dr. Jose Garcia.  Dr. Garcia testified that Penry suffered from organic brain damage and moderate retardation, which resulted in poor impulse control and an inability to learn from experience.  *Id.*, at 18, 19, 87–90.  Dr. Garcia indicated that Penry's brain damage was probably caused at birth, *id.*, at 106, but may have been caused by beatings and multiple injuries to the

---

[1] Persons who are mentally retarded are described as having "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period."  American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation 1 (H. Grossman ed. 1983). To be classified as mentally retarded, a person generally must have an IQ of 70 or below.  *Id.*, at 11.  Under the AAMR classification system, individuals with IQ scores between 50–55 and 70 have "mild" retardation. Individuals with scores between 35–40 and 50–55 have "moderate" retardation.  "Severely" retarded people have IQ scores between 20–25 and 35–40, and "profoundly" retarded people have scores below 20 or 25.  *Id.*, at 13.  Approximately 89% of retarded persons are "mildly" retarded. Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 423 (1985).

brain at an early age. *Id.*, at 18, 90. In Dr. Garcia's judgment, Penry was suffering from an organic brain disorder at the time of the offense which made it impossible for him to appreciate the wrongfulness of his conduct or to conform his conduct to the law. *Id.*, at 86–87.

Penry's mother testified at trial that Penry was unable to learn in school and never finished the first grade. Penry's sister testified that their mother had frequently beaten him over the head with a belt when he was a child. Penry was also routinely locked in his room without access to a toilet for long periods of time. *Id.*, at 124, 126, 127. As a youngster, Penry was in and out of a number of state schools and hospitals, until his father removed him from state schools altogether when he was 12. *Id.*, at 120. Penry's aunt subsequently struggled for over a year to teach Penry how to print his name. *Id.*, at 133.

The State introduced the testimony of two psychiatrists to rebut the testimony of Dr. Garcia. Dr. Kenneth Vogtsberger testified that although Penry was a person of limited mental ability, he was not suffering from any mental illness or defect at the time of the crime, and that he knew the difference between right and wrong and had the potential to honor the law. *Id.*, at 144–145. In his view, Penry had characteristics consistent with an antisocial personality, including an inability to learn from experience and a tendency to be impulsive and to violate society's norms. *Id.*, at 149–150. He testified further that Penry's low IQ scores underestimated his alertness and understanding of what went on around him. *Id.*, at 146.

Dr. Felix Peebles also testified for the State that Penry was legally sane at the time of the offense and had a "full-blown anti-social personality." *Id.*, at 171. In addition, Dr. Peebles testified that he personally diagnosed Penry as being mentally retarded in 1973 and again in 1977, and that Penry "had a very bad life generally, bringing up." *Id.*, at 168–169. In Dr. Peebles' view, Penry "had been socially and

emotionally deprived and he had not learned to read and write adequately." *Id.*, at 169. Although they disagreed with the defense psychiatrist over the extent and cause of Penry's mental limitations, both psychiatrists for the State acknowledged that Penry was a person of extremely limited mental ability, and that he seemed unable to learn from his mistakes. *Id.*, at 149, 172–173.

The jury rejected Penry's insanity defense and found him guilty of capital murder. Tex. Penal Code Ann. § 19.03 (1974 and Supp. 1989). The following day, at the close of the penalty hearing, the jury decided the sentence to be imposed on Penry by answering three "special issues":

> "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
>
> "(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981 and Supp. 1989).

If the jury unanimously answers "yes" to each issue submitted, the trial court must sentence the defendant to death. Arts. 37.071(c)–(e). Otherwise, the defendant is sentenced to life imprisonment. *Ibid.*

Defense counsel raised a number of objections to the proposed charge to the jury. With respect to the first special issue, he objected that the charge failed to define the term "deliberately." App. 210. With respect to the second special issue, he objected that the charge failed to define the terms "probability," "criminal acts of violence," and "continuing threat to society." *Id.*, at 210–211. Defense counsel

also objected to the charge because it failed to "authorize a discretionary grant of mercy based upon the existence of mitigating circumstances" and because it "fail[ed] to require as a condition to the assessment of the death penalty that the State show beyond a reasonable doubt that any aggravating circumstances found to exist outweigh any mitigating circumstances." *Id.*, at 211. In addition, the charge failed to instruct the jury that it may take into consideration all of the evidence whether aggravating or mitigating in nature which was submitted in the full trial of the case. *Id.*, at 212. Defense counsel also objected that, in light of Penry's mental retardation, permitting the jury to assess the death penalty in this case amounted to cruel and unusual punishment prohibited by the Eighth Amendment. *Id.*, at 211.

These objections were overruled by the trial court. The jury was then instructed that the State bore the burden of proof on the special issues, and that before any issue could be answered "yes," all 12 jurors must be convinced by the evidence beyond a reasonable doubt that the answer to that issue should be "yes." *Id.*, at 25. The jurors were further instructed that in answering the three special issues, they could consider all the evidence submitted in both the guilt-innocence phase and the penalty phase of the trial. *Id.*, at 26. The jury charge then listed the three questions, with the names of the defendant and the deceased inserted.

The jury answered "yes" to all three special issues, and Penry was sentenced to death. The Texas Court of Criminal Appeals affirmed his conviction and sentence on direct appeal. *Penry v. State*, 691 S. W. 2d 636 (1985). That court held that terms such as "deliberately," "probability," and "continuing threat to society" used in the special issues need not be defined in the jury charge because the jury would know their common meaning. *Id.*, at 653–654. The court concluded that Penry was allowed to present all relevant mitigating evidence at the punishment hearing, and that there was no constitutional infirmity in failing to

require the jury to find that aggravating circumstances outweighed mitigating ones or in failing to authorize a discretionary grant of mercy based upon the existence of mitigating circumstances. *Id.*, at 654. The court also held that imposition of the death penalty was not prohibited by virtue of Penry's mental retardation. *Id.*, at 654–655. This Court denied certiorari on direct review. *Sub nom. Penry* v. *Texas*, 474 U. S. 1073 (1986).

Penry then filed this federal habeas corpus petition challenging his death sentence. Among other claims, Penry argued that he was sentenced in violation of the Eighth Amendment because the trial court failed to instruct the jury on how to weigh mitigating factors in answering the special issues and failed to define the term "deliberately." Penry also argued that it was cruel and unusual punishment to execute a mentally retarded person. The District Court denied relief, App. 234–273, and Penry appealed to the Court of Appeals for the Fifth Circuit.

The Court of Appeals affirmed the District Court's judgment. 832 F. 2d 915 (1987). The court stressed, however, that it found considerable merit in Penry's claim that the jury was not allowed to consider and apply all of his personal mitigating circumstances in answering the Texas special issues. Although the jury was presented with evidence that might mitigate Penry's personal culpability for the crime, such as his mental retardation, arrested emotional development, and abused background, the jury could not give effect to that evidence by mitigating Penry's sentence to life imprisonment. "Having said that it was a deliberate murder and that Penry will be a continuing threat, the jury can say no more." *Id.*, at 920. In short, the court did not see how Penry's mitigating evidence, under the instructions given, could be fully acted upon by the jury because "[t]here is no place for the jury to say 'no' to the death penalty" based on the mitigating force of those circumstances. *Id.*, at 925. Although the court questioned whether Penry was given the individual-

ized sentencing that the Constitution requires, it ultimately concluded that prior Circuit decisions required it to reject Penry's claims. *Id.*, at 926. The court also rejected Penry's contention that it was cruel and unusual punishment to execute a mentally retarded person such as himself. *Id.*, at 918 (citing *Brogdon* v. *Butler*, 824 F. 2d 338, 341 (CA5 1987)).

We granted certiorari to resolve two questions. 487 U. S. 1233 (1988). First, was Penry sentenced to death in violation of the Eighth Amendment because the jury was not adequately instructed to take into consideration all of his mitigating evidence and because the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to his mitigating evidence in answering them? Second, is it cruel and unusual punishment under the Eighth Amendment to execute a mentally retarded person with Penry's reasoning ability?

## II

### A

Penry is currently before the Court on his petition in federal court for a writ of habeas corpus. Because Penry is before us on collateral review, we must determine, as a threshold matter, whether granting him the relief he seeks would create a "new rule." *Teague* v. *Lane*, 489 U. S. 288, 301 (1989). Under *Teague*, new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions. *Id.*, at 311–313.

*Teague* was not a capital case, and the plurality opinion expressed no views regarding how the retroactivity approach adopted in *Teague* would be applied in the capital sentencing context. *Id.*, at 314, n. 2. The plurality noted, however, that a criminal judgment necessarily includes the sentence imposed, and that collateral challenges to sentences "delay the enforcement of the judgment at issue and decrease the possibility that 'there will at some point be the certainty that comes with an end to litigation.'" *Ibid.* (quoting *Sanders* v.

*United States*, 373 U. S. 1, 25 (1963) (Harlan, J., dissenting)). See also *Mackey* v. *United States*, 401 U. S. 667, 690–695 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). In our view, the finality concerns underlying Justice Harlan's approach to retroactivity are applicable in the capital sentencing context, as are the two exceptions to his general rule of nonretroactivity. See *Teague*, *supra*, at 311–313.

## B

As we indicated in *Teague*, "[i]n general . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." 489 U. S., at 301. Or, "[t]o put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Ibid.* (emphasis in original). *Teague* noted that "[i]t is admittedly often difficult to determine when a case announces a new rule." *Ibid.* Justice Harlan recognized "the inevitable difficulties that will arise in attempting 'to determine whether a particular decision has really announced a "new" rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law.'" *Mackey*, *supra*, at 695 (opinion concurring in judgments in part and dissenting in part) (quoting *Desist* v. *United States*, 394 U. S. 244, 263 (1969) (Harlan, J., dissenting)). See generally *Yates* v. *Aiken*, 484 U. S. 211, 216–217 (1988) (concluding that *Francis* v. *Franklin*, 471 U. S. 307 (1985), did not announce a new rule but was "merely an application of the principle that governed our decision in *Sandstrom* v. *Montana*, [442 U. S. 510 (1979),] which had been decided before petitioner's trial took place").

Penry's conviction became final on January 13, 1986, when this Court denied his petition for certiorari on direct review of his conviction and sentence. *Sub nom. Penry* v. *Texas*, *supra*. This Court's decisions in *Lockett* v. *Ohio*, 438 U. S.

586 (1978), and *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), were rendered before his conviction became final. Under the retroactivity principles adopted in *Griffith* v. *Kentucky,* 479 U. S. 314 (1987), Penry is entitled to the benefit of those decisions. Citing *Lockett* and *Eddings,* Penry argues that he was sentenced to death in violation of the Eighth Amendment because, in light of the jury instructions given, the jury was unable to fully consider and give effect to the mitigating evidence of his mental retardation and abused background, which he offered as the basis for a sentence less than death. Penry thus seeks a rule that when such mitigating evidence is presented, Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether a defendant should be sentenced to death. We conclude, for the reasons discussed below, that the rule Penry seeks is not a "new rule" under *Teague.*

Penry does not challenge the facial validity of the Texas death penalty statute, which was upheld against an Eighth Amendment challenge in *Jurek* v. *Texas,* 428 U. S. 262 (1976). Nor does he dispute that some types of mitigating evidence can be fully considered by the sentencer in the absence of special jury instructions. See *Franklin* v. *Lynaugh,* 487 U. S. 164, 175 (1988) (plurality opinion); *id.,* at 185–186 (O'CONNOR, J., concurring in judgment). Instead, Penry argues that, on the facts of this case, the jury was unable to fully consider and give effect to the mitigating evidence of his mental retardation and abused background in answering the three special issues. In our view, the relief Penry seeks does not "impos[e] a new obligation" on the State of Texas. *Teague, supra,* at 301. Rather, Penry simply asks the State to fulfill the assurance upon which *Jurek* was based: namely, that the special issues would be interpreted broadly enough to permit the sentencer to consider all of the relevant mitigating evidence a defendant might present in imposing sentence.

In *Jurek*, the joint opinion of Justices Stewart, Powell, and STEVENS noted that the Texas statute narrowed the circumstances in which the death penalty could be imposed to five categories of murders. 428 U. S., at 268. Thus, although Texas had not adopted a list of statutory aggravating factors that the jury must find before imposing the death penalty, "its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose," *id.*, at 270, and effectively "requires the sentencing authority to focus on the particularized nature of the crime." *Id.*, at 271. To provide the individualized sentencing determination required by the Eighth Amendment, however, the sentencer must be allowed to consider mitigating evidence. *Ibid.* Indeed, as *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), made clear, "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.*, at 304 (plurality opinion).

Because the Texas death penalty statute does not explicitly mention mitigating circumstances, but rather directs the jury to answer three questions, *Jurek* reasoned that the statute's constitutionality "turns on whether the enumerated questions allow consideration of particularized mitigating factors." 428 U. S., at 272. Although the various terms in the special questions had yet to be defined, the joint opinion concluded that the sentencing scheme satisfied the Eighth Amendment on the assurance that the Texas Court of Criminal Appeals would interpret the question concerning future dangerousness so as to allow the jury to consider whatever mitigating circumstances a defendant may be able to show, including a defendant's prior criminal record, age, and mental or emotional state. *Id.*, at 272–273.

Our decisions subsequent to *Jurek* have reaffirmed that the Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty. In *Lockett* v. *Ohio*, 438 U. S. 586 (1978), a plurality of this Court held that the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.*, at 604 (emphasis in original). Thus, the Court held unconstitutional the Ohio death penalty statute which mandated capital punishment upon a finding of one aggravating circumstance unless one of three statutory mitigating factors were present.

*Lockett* underscored *Jurek*'s recognition that the constitutionality of the Texas scheme "turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Jurek, supra,* at 272. The plurality opinion in *Lockett* indicated that the Texas death penalty statute had "survived the petitioner's Eighth and Fourteenth Amendment attack [in *Jurek*] because three Justices concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question—despite its facial narrowness—so as to permit the sentencer to consider 'whatever mitigating circumstances' the defendant might be able to show." 438 U. S., at 607. Thus, the *Lockett* plurality noted that neither the Texas statute upheld in 1976 nor the statutes that had survived facial challenges in *Gregg* v. *Georgia*, 428 U. S. 153 (1976), and *Proffitt* v. *Florida*, 428 U. S. 242 (1976), "clearly operated at that time to prevent the sentencer from considering any aspect of the defendant's character and record or any circumstances of his offense as an independently mitigating factor." *Lockett, supra,* at 607. Cf. *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987) (sustaining "as applied" challenge to Florida death penalty statute); *Godfrey*

v. *Georgia*, 446 U. S. 420 (1980) (sustaining "as applied" challenge to Georgia death penalty statute).

In *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), a majority of the Court reaffirmed that a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death. In *Eddings*, the Oklahoma death penalty statute permitted the defendant to introduce evidence of any mitigating circumstance, but the sentencing judge concluded, as a matter of law, that he was unable to consider mitigating evidence of the youthful defendant's troubled family history, beatings by a harsh father, and emotional disturbance. Applying *Lockett*, we held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." 455 U. S., at 113–114 (emphasis in original). In that case, "it was as if the trial judge had instructed a jury to disregard the mitigating evidence [the defendant] proffered on his behalf." *Id.*, at 114.

Thus, at the time Penry's conviction became final, it was clear from *Lockett* and *Eddings* that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty. Moreover, the facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present. Penry argues that those assurances were not fulfilled *in his particular case* because, without appropriate instructions, the jury could not fully consider and give effect to the mitigating evidence of his mental retardation and abused childhood in rendering its sentencing decision. The rule

Penry seeks—that when such mitigating evidence is presented, Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed— is not a "new rule" under *Teague* because it is dictated by *Eddings* and *Lockett*. Moreover, in light of the assurances upon which *Jurek* was based, we conclude that the relief Penry seeks does not "impos[e] a new obligation" on the State of Texas. *Teague*, 489 U. S., at 301.

### III

Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring). Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock* v. *Dugger, supra.* Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that death is the appropriate sentence. *Woodson*, 428 U. S., at 304, 305. "Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California* v. *Brown, supra*, at 545 (O'CONNOR, J., concurring) (emphasis in original).

Although Penry offered mitigating evidence of his mental retardation and abused childhood as the basis for a sentence of life imprisonment rather than death, the jury that sentenced him was only able to express its views on the appropriate sentence by answering three questions: Did Penry act deliberately when he murdered Pamela Carpenter?  Is there a probability that he will be dangerous in the future?  Did he act unreasonably in response to provocation?  The jury was never instructed that it could consider the evidence offered by Penry as *mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence.

Like the petitioner in *Franklin v. Lynaugh,* Penry contends that in the absence of his requested jury instructions, the Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced.  *Franklin* was the first case considered by this Court since *Jurek* to address a claim concerning the treatment of mitigating evidence under the Texas special issues.  Like *Jurek* itself, *Franklin* did not produce a majority opinion for the Court.  The *Franklin* plurality, and the two concurring Justices, concluded that Franklin was not sentenced to death in violation of the Eighth Amendment because the jury was free to give effect to his mitigating evidence of good behavior in prison by answering "no" to the question on future dangerousness. 487 U. S., at 177 (plurality opinion); *id.,* at 185 (O'CONNOR, J., concurring in judgment).  Moreover, a majority agreed that "residual doub[t]" as to Franklin's guilt was not a constitutionally mandated mitigating factor.  *Id.,* at 173, and n. 6 (plurality opinion); *id.,* at 187–188 (O'CONNOR, J., concurring in judgment).

In *Franklin,* however, the five concurring and dissenting Justices did not share the plurality's categorical reading of *Jurek.*  In the plurality's view, *Jurek* had expressly and unconditionally upheld the manner in which mitigating evidence is considered under the special issues.  *Id.,* at 179–180, and

n. 10. In contrast, five Members of the Court read *Jurek* as not precluding a claim that, in a particular case, the jury was unable to fully consider the mitigating evidence introduced by a defendant in answering the special issues. 487 U. S., at 183 (O'CONNOR, J., concurring in judgment); *id.*, at 199–200 (STEVENS, J., dissenting). Indeed, both the concurrence and the dissent understood *Jurek* as resting fundamentally on the express assurance that the special issues would permit the jury to fully consider all the mitigating evidence a defendant introduced that was relevant to the defendant's background and character and to the circumstances of the offense. Moreover, both the concurrence and the dissent stressed that "the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration" in imposing sentence. 487 U. S., at 185 (O'CONNOR, J., concurring in judgment); *id.*, at 199 (STEVENS, J., dissenting).

The concurrence in *Franklin* concluded that there was no Eighth Amendment violation in that case because Franklin's evidence of his good prison behavior had no clear relevance to his character other than to demonstrate his ability to live in a highly structured prison environment without endangering others. Thus, the jury was able to give effect to the mitigating force of this evidence in answering the second special issue. The concurrence noted, however:

> "If . . . petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence. If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation." *Id.*, at 185.

Penry argues that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its "reasoned moral response" to that evidence in determining whether death was the appropriate punishment. We agree. Thus, we reject the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the special issues without any jury instructions on mitigating evidence.

The first special issue asks whether the defendant acted "deliberately and with the reasonable expectation that the death of the deceased . . . would result." Neither the Texas Legislature nor the Texas Court of Criminal Appeals have defined the term "deliberately," and the jury was not instructed on the term, so we do not know precisely what meaning the jury gave to it. Assuming, however, that the jurors in this case understood "deliberately" to mean something more than that Penry was guilty of "intentionally" committing murder, those jurors may still have been unable to give effect to Penry's mitigating evidence in answering the first special issue.

Penry's mental retardation was relevant to the question whether he was capable of acting "deliberately," but it also "had relevance to [his] moral culpability beyond the scope of the special verdict questio[n]." *Franklin, supra,* at 185. Personal culpability is not solely a function of a defendant's capacity to act "deliberately." A rational juror at the penalty phase of the trial could have concluded, in light of Penry's confession, that he deliberately killed Pamela Carpenter to escape detection. Because Penry was mentally retarded, however, and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, and because of his history of childhood abuse, that same juror could also conclude that Penry was less morally "culpable than defendants who have no such excuse," but

who acted "deliberately" as that term is commonly understood. *California* v. *Brown*, 479 U. S., at 545 (O'CONNOR, J., concurring). See also *Skipper* v. *South Carolina*, 476 U. S. 1, 13–14 (1986) (Powell, J., concurring in judgment) (evidence concerning a defendant's "emotional history . . . bear[s] directly on the fundamental justice of imposing capital punishment").

In the absence of jury instructions defining "deliberately" in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue. Without such a special instruction, a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime "deliberately." Thus, we cannot be sure that the jury's answer to the first special issue reflected a "reasoned moral response" to Penry's mitigating evidence.

The second special issue asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The mitigating evidence concerning Penry's mental retardation indicated that one effect of his retardation is his inability to learn from his mistakes. Although this evidence is relevant to the second issue, it is relevant only as an *aggravating* factor because it suggests a "yes" answer to the question of future dangerousness. The prosecutor argued at the penalty hearing that there was "a very strong probability, based on the history of this defendant, his previous criminal record, and the psychiatric testimony that we've had in this case, that the defendant will continue to commit acts of this nature." App. 214. Even in a prison setting, the prosecutor

argued, Penry could hurt doctors, nurses, librarians, or teachers who worked in the prison.

Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future. As Judge Reavley wrote for the Court of Appeals below:

> "What was the jury to do if it decided that Penry, because of retardation, arrested emotional development and a troubled youth, should not be executed? If anything, the evidence made it more likely, not less likely, that the jury would answer the second question yes. It did not allow the jury to consider a major thrust of Penry's evidence as *mitigating* evidence." 832 F. 2d, at 925 (footnote omitted) (emphasis in original).

The second special issue, therefore, did not provide a vehicle for the jury to give mitigating effect to Penry's evidence of mental retardation and childhood abuse.

The third special issue asks "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." On this issue, the State argued that Penry stabbed Pamela Carpenter with a pair of scissors not in response to provocation, but "for the purpose of avoiding detection." App. 215. Penry's own confession indicated that he did not stab the victim after she wounded him superficially with a scissors during a struggle, but rather killed her after her struggle had ended and she was lying helpless. Even if a juror concluded that Penry's mental retardation and arrested emotional development rendered him less culpable for his crime than a normal adult, that would not necessarily diminish the "unreasonableness" of his conduct in response to "the provocation, if any, by the deceased." Thus, a juror who believed Penry lacked the moral culpability to be sentenced to death could not express that view in answering the third special issue if she also con-

cluded that Penry's action was not a reasonable response to provocation.

The State contends, notwithstanding the three interrogatories, that Penry was free to introduce and argue the significance of his mitigating circumstances to the jury. In fact, defense counsel did argue that if a juror believed that Penry, because of the mitigating evidence of his mental retardation and abused background, did not deserve to be put to death, the juror should vote "no" on one of the special issues even if she believed the State had proved that the answer should be "yes." Thus, Penry's counsel stressed the evidence of Penry's mental retardation and abused background, and asked the jurors, "can you be proud to be a party to putting a man to death with that affliction?" App. 222. He urged the jury to answer the first special issue "no" because "it would be the just answer, and I think it would be a proper answer." *Id.*, at 223. As for the prediction of the prosecution psychiatrist that Penry was likely to continue to get into trouble, the defense argued: "That may be true. But, a boy with this mentality, with this mental affliction, even though you have found that issue against us as to insanity, I don't think that there is any question in a single one of you juror's *[sic]* minds that there is something definitely wrong, basically, with this boy. And I think there is not a single one of you that doesn't believe that this boy had brain damage. . . ." *Id.*, at 223–224. In effect, defense counsel urged the jury to "[t]hink about each of those special issues and see if you don't find that we're inquiring into the mental state of the defendant in each and every one of them." *Id.*, at 221.

In rebuttal, the prosecution countered by stressing that the jurors had taken an oath to follow the law, and that they must follow the instructions they were given in answering the special issues:

> "You've all taken an oath to follow the law and you know what the law is. . . . In answering these questions based on the evidence and following the law, and that's all that

I asked you to do, is to go out and look at the evidence. The burden of proof is on the State as it has been from the beginning, and we accept that burden. And I honestly believe that we have more than met that burden, and that's the reason that you didn't hear Mr. Newman [defense attorney] argue. He didn't pick out these issues and point out to you where the State had failed to meet this burden. He didn't point out the weaknesses in the State's case because, ladies and gentlemen, I submit to you we've met our burden. . . . [Y]our job as jurors and your duty as jurors is not to act on your emotions, but to act on the law as the Judge has given it to you, and on the evidence that you have heard in this courtroom, then answer those questions accordingly." *Id.*, at 225–226.

In light of the prosecutor's argument, and in the absence of appropriate jury instructions, a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence.

The State conceded at oral argument in this Court that if a juror concluded that Penry acted deliberately and was likely to be dangerous in the future, but also concluded that because of his mental retardation he was not sufficiently culpable to deserve the death penalty, that juror would be unable to give effect to that mitigating evidence under the instructions given in this case. Tr. of Oral Arg. 38. The State contends, however, that to instruct the jury that it could render a discretionary grant of mercy, or say "no" to the death penalty, based on Penry's mitigating evidence, would be to return to the sort of unbridled discretion that led to *Furman* v. *Georgia*, 408 U. S. 238 (1972). We disagree.

To be sure, *Furman* held that "in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing author-

ity would focus on the particularized circumstances of the crime and the defendant." *Gregg* v. *Georgia*, 428 U. S. 153, 199 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). But as we made clear in *Gregg*, so long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant. *Id.*, at 197–199, 203. As JUSTICE WHITE wrote in *Gregg:*

> "The Georgia legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute, and I cannot accept the naked assertion that the effort is bound to fail. As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is particularly appropriate as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to expect that juries — even given discretion *not* to impose the death penalty — will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device." *Id.*, at 222 (opinion concurring in judgment).

"In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey* v. *Kemp*, 481 U. S. 279, 304 (1987) (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give

effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a "'reasoned *moral* response to the defendant's background, character, and crime.'" *Franklin*, 487 U. S., at 184 (O'CONNOR, J., concurring in judgment) (quoting *California* v. *Brown*, 479 U. S., at 545 (O'CONNOR, J., concurring)). In order to ensure "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson*, 428 U. S., at 305, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime.

In this case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its "reasoned moral response" to that evidence in rendering its sentencing decision. Our reasoning in *Lockett* and *Eddings* thus compels a remand for resentencing so that we do not "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Lockett*, 438 U. S., at 605; *Eddings*, 455 U. S., at 119 (O'CONNOR, J., concurring). "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett, supra*, at 605.

## IV

Penry's second claim is that it would be cruel and unusual punishment, prohibited by the Eighth Amendment, to execute a mentally retarded person like himself with the reasoning capacity of a 7-year-old. He argues that because of their mental disabilities, mentally retarded people do not possess the level of moral culpability to justify imposing the death

sentence. He also argues that there is an emerging national consensus against executing the mentally retarded. The State responds that there is insufficient evidence of a national consensus against executing the retarded, and that existing procedural safeguards adequately protect the interests of mentally retarded persons such as Penry.

A

Under *Teague*, we address the retroactivity issue as a threshold matter because Penry is before us on collateral review. 489 U. S., at 310. If we were to hold that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry, we would be announcing a "new rule." *Id.*, at 301. Such a rule is not dictated by precedent existing at the time Penry's conviction became final. Moreover, such a rule would "brea[k] new ground" and would impose a new obligation on the States and the Federal Government. *Ibid.* (citing *Ford* v. *Wainwright*, 477 U. S. 399, 410 (1986), which held that the Eighth Amendment prohibits the execution of insane persons, as a case announcing a new rule).

In *Teague*, we concluded that a new rule will not be applied retroactively to defendants on collateral review unless it falls within one of two exceptions. Under the first exception articulated by Justice Harlan, a new rule will be retroactive if it places "'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Teague, supra*, at 307 (quoting *Mackey*, 401 U. S., at 692 (Harlan, J., concurring in judgments in part and dissenting in part)). Although *Teague* read this exception as focusing solely on new rules according constitutional protection to an actor's primary conduct, Justice Harlan did speak in terms of substantive categorical guarantees accorded by the Constitution, regardless of the procedures followed. This Court subsequently held that the Eighth Amendment, as a substantive matter, prohibits imposing the death penalty on a certain class of defendants because of their

status, *Ford* v. *Wainwright, supra,* at 410 (insanity), or because of the nature of their offense, *Coker* v. *Georgia,* 433 U. S. 584 (1977) (rape) (plurality opinion). In our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all. In both cases, the Constitution itself deprives the State of the power to impose a certain penalty, and the finality and comity concerns underlying Justice Harlan's view of retroactivity have little force. As Justice Harlan wrote: "There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose." *Mackey, supra,* at 693. Therefore, the first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review. Accordingly, we address the merits of Penry's claim.

### B

The Eighth Amendment categorically prohibits the infliction of cruel and unusual punishments. At a minimum, the Eighth Amendment prohibits punishment considered cruel and unusual at the time the Bill of Rights was adopted. *Ford* v. *Wainwright, supra,* at 405; *Solem* v. *Helm,* 463 U. S. 277, 285–286 (1983). The prohibitions of the Eighth Amendment are not limited, however, to those practices condemned by the common law in 1789. *Ford, supra,* at 406; *Gregg* v. *Georgia,* 428 U. S., at 171. The prohibition against cruel and unusual punishments also recognizes the "evolving stand-

ards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion); *Ford, supra,* at 406. In discerning those "evolving standards," we have looked to objective evidence of how our society views a particular punishment today. See *Coker* v. *Georgia, supra,* at 593–597; *Enmund* v. *Florida,* 458 U. S. 782, 788–796 (1982). The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures. We have also looked to data concerning the actions of sentencing juries. *Enmund, supra,* at 794–796; *Thompson* v. *Oklahoma,* 487 U. S. 815, 831 (1988) (plurality opinion).

It was well settled at common law that "idiots," together with "lunatics," were not subject to punishment for criminal acts committed under those incapacities. As Blackstone wrote:

> "The second case of a deficiency in will, which excuses from the guilt of crimes, arises also from a defective or vitiated understanding, viz. in an *idiot* or a *lunatic.* . . . [I]diots and lunatics are not chargeable for their own acts, if committed when under these incapacities: no, not even for treason itself. . . . [A] total idiocy, or absolute insanity, excuses from the guilt, and of course from the punishment, of any criminal action committed under such deprivation of the senses. . . . " 4 W. Blackstone, Commentaries *24– *25 (emphasis in original).

See also 1 W. Hawkins, Pleas of the Crown 1–2 (7th ed. 1795) ("[T]hose who are under a natural disability of distinguishing between good and evil, as . . . ideots, and lunaticks are not punishable by any criminal prosecution whatsoever"). Idiocy was understood as "a defect of understanding from the moment of birth," in contrast to lunacy, which was "a partial derangement of the intellectual faculties, the senses returning at uncertain intervals." *Id.,* at 2, n. 2.

There was no one definition of idiocy at common law, but the term "idiot" was generally used to describe persons who

had a total lack of reason or understanding, or an inability to distinguish between good and evil. Hale wrote that a person who is deaf and mute from birth "is in presumption of law an ideot . . . because he hath no possibility to understand what is forbidden by law to be done, or under what penalties: but if it can appear, that he hath the use of understanding, . . . then he may be tried, and suffer judgment and execution." 1 M. Hale, Pleas of the Crown 34 (1736) (footnote omitted). See also *id.*, at 29 (citing A. Fitzherbert, 2 Natura Brevium 233 (7th ed. 1730)); *Trial of Edward Arnold,* 16 How. St. Tr. 695, 765 (Eng. 1724) ("[A] man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast, such a one is never the object of punishment"); S. Glueck, Mental Disorder and the Criminal Law 128–144 (1925).

The common law prohibition against punishing "idiots" and "lunatics" for criminal acts was the precursor of the insanity defense, which today generally includes "mental defect" as well as "mental disease" as part of the legal definition of insanity. See, *e. g.,* American Law Institute, Model Penal Code § 4.01, p. 61 (1985) ("A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law"); 18 U. S. C. § 17 (1982 ed., Supp. V) (it is an affirmative defense to federal prosecution if "the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts" at the time the offense was committed). See generally Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 432–444 (1985).

In its emphasis on a permanent, congenital mental deficiency, the old common law notion of "idiocy" bears some similarity to the modern definition of mental retardation. Ellis & Luckasson, *supra,* at 417. The common law prohi-

bition against punishing "idiots" generally applied, however, to persons of such severe disability that they lacked the reasoning capacity to form criminal intent or to understand the difference between good and evil. In the 19th and early 20th centuries, the term "idiot" was used to describe the most retarded of persons, corresponding to what is called "profound" and "severe" retardation today. See AAMR, Classification in Mental Retardation 179 (H. Grossman ed. 1983); *id.*, at 9 ("idiots" generally had IQ of 25 or below).

The common law prohibition against punishing "idiots" for their crimes suggests that it may indeed be "cruel and unusual" punishment to execute persons who are profoundly or severely retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions. Because of the protections afforded by the insanity defense today, such a person is not likely to be convicted or face the prospect of punishment. See ABA Standards for Criminal Justice 7–9.1, commentary, p. 460 (2d ed. 1980) (most retarded people who reach the point of sentencing are mildly retarded). Moreover, under *Ford* v. *Wainwright*, 477 U. S. 399 (1986), someone who is "unaware of the punishment they are about to suffer and why they are to suffer it" cannot be executed. *Id.*, at 422 (Powell, J., concurring in part and concurring in judgment).

Such a case is not before us today. Penry was found competent to stand trial. In other words, he was found to have the ability to consult with his lawyer with a reasonable degree of rational understanding, and was found to have a rational as well as factual understanding of the proceedings against him. *Dusky* v. *United States*, 362 U. S. 402 (1960); App. 20–24. In addition, the jury rejected his insanity defense, which reflected their conclusion that Penry knew that his conduct was wrong and was capable of conforming his conduct to the requirements of the law. Tex. Penal Code Ann. § 8.01(a) (1974 and Supp. 1989).

Penry argues, however, that there is objective evidence today of an emerging national consensus against execution of

the mentally retarded, reflecting the "evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S., at 101. Brief for Petitioner 37–39. The federal Anti-Drug Abuse Act of 1988, Pub. L. 100–690, § 7001(l), 102 Stat. 4390, 21 U. S. C. § 848*(l)* (1988 ed.), prohibits execution of a person who is mentally retarded. Only one State, however, currently bans execution of retarded persons who have been found guilty of a capital offense. Ga. Code Ann. § 17–7–131(j) (Supp. 1988). Maryland has enacted a similar statute which will take effect on July 1, 1989. Md. Ann. Code, Art. 27, § 412(f)(1) (1989).

In contrast, in *Ford* v. *Wainwright*, which held that the Eighth Amendment prohibits execution of the insane, considerably more evidence of a national consensus was available. No State permitted the execution of the insane, and 26 States had statutes explicitly requiring suspension of the execution of a capital defendant who became insane. *Ford*, 477 U. S., at 408, n. 2. Other States had adopted the common law prohibition against executing the insane. *Ibid.* Moreover, in examining the objective evidence of contemporary standards of decency in *Thompson* v. *Oklahoma*, the plurality noted that 18 States expressly established a minimum age in their death penalty statutes, and all of them required that the defendant have attained at least the age of 16 at the time of the offense. 487 U. S., at 829, and n. 30. In our view, the two state statutes prohibiting execution of the mentally retarded, even when added to the 14 States that have rejected capital punishment completely, do not provide sufficient evidence at present of a national consensus.

Penry does not offer any evidence of the general behavior of juries with respect to sentencing mentally retarded defendants, nor of decisions of prosecutors. He points instead to several public opinion surveys that indicate strong public opposition to execution of the retarded. For example, a poll taken in Texas found that 86% of those polled supported the death penalty, but 73% opposed its application to the men-

tally retarded. Reply Brief for Petitioner 6–7; Austin American Statesman, November 15, 1988, p. B3. A Florida poll found 71% of those surveyed were opposed to the execution of mentally retarded capital defendants, while only 12% were in favor. Brief for Petitioner 38; App. 279. A Georgia poll found 66% of those polled opposed to the death penalty for the retarded, 17% in favor, with 16% responding that it depends how retarded the person is. Brief for Petitioner 38; App. 283. In addition, the AAMR, the country's oldest and largest organization of professionals working with the mentally retarded, opposes the execution of persons who are mentally retarded. AAMR, Resolution on Mental Retardation and the Death Penalty, January 1988, App. to Brief for American Association on Mental Retardation et al. as *Amici Curiae* 1a–2a (hereafter *Amici* Brief for AAMR et al.). The public sentiment expressed in these and other polls and resolutions may ultimately find expression in legislation, which is an objective indicator of contemporary values upon which we can rely. But at present, there is insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses for us to conclude that it is categorically prohibited by the Eighth Amendment.

## C

Relying largely on objective evidence such as the judgments of legislatures and juries, we have also considered whether application of the death penalty to particular categories of crimes or classes of offenders violates the Eighth Amendment because it "makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering" or because it is "grossly out of proportion to the severity of the crime." *Coker* v. *Georgia*, 433 U. S., at 592 (plurality opinion); *Thompson* v. *Oklahoma*, 487 U. S., at 833 (plurality opinion); *Tison* v. *Arizona*, 481 U. S. 137 (1987); *Enmund* v. *Florida*, 458 U. S., at 798–801. *Gregg* noted

that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg* v. *Georgia*, 428 U. S., at 183 (joint opinion of Stewart, Powell, and STEVENS, JJ.). "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison* v. *Arizona, supra,* at 149. See also *Enmund, supra,* at 825 (O'CONNOR, J., dissenting) (the Eighth Amendment concept of "proportionality requires a nexus between the punishment imposed and the defendant's blameworthiness").

Penry argues that execution of a mentally retarded person like himself with a reasoning capacity of approximately a 7-year-old would be cruel and unusual because it is disproportionate to his degree of personal culpability. Brief for Petitioner 49–50. Just as the plurality in *Thompson* reasoned that a juvenile is less culpable than an adult for the same crime, 487 U. S., at 835, Penry argues that mentally retarded people do not have the judgment, perspective, and self-control of a person of normal intelligence. In essence, Penry argues that because of his diminished ability to control his impulses, to think in long-range terms, and to learn from his mistakes, he "is not capable of acting with the degree of culpability that can justify the ultimate penalty," *id.,* at 823.

The AAMR and other groups working with the mentally retarded agree with Penry. They argue as *amici* that all mentally retarded people, regardless of their degree of retardation, have substantial cognitive and behavioral disabilities that reduce their level of blameworthiness for a capital offense. *Amici* Brief for AAMR et al. 5–9, 13–15. *Amici* do not argue that people with mental retardation cannot be held responsible or punished for criminal acts they commit. Rather, they contend that because of "disability in the areas of cognitive impairment, moral reasoning, control of impulsivity, and the ability to understand basic relationships between cause and effect," mentally retarded people cannot act

with the level of moral culpability that would justify imposition of the death sentence. *Id.*, at 4. Thus, in their view, execution of mentally retarded people convicted of capital offenses serves no valid retributive purpose. *Id.*, at 19.

It is clear that mental retardation has long been regarded as a factor that may diminish an individual's culpability for a criminal act. See *supra*, at 331–333; ABA Standards for Criminal Justice 7–9.3, commentary, at 463; *State* v. *Hall*, 176 Neb. 295, 310, 125 N. W. 2d 918, 927 (1964). See generally Ellis & Luckasson, 53 Geo. Wash. L. Rev., at 414. In its most severe forms, mental retardation may result in complete exculpation from criminal responsibility. Moreover, virtually all of the States with death penalty statutes that list statutory mitigating factors include as a mitigating circumstance evidence that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."[2] A number of States explicitly mention "mental defect" in connection with such a mitigating circumstance.[3] Indeed, as the Court holds in Part III of this opinion, the sentencing body must be allowed to consider mental retardation

---

[2] Ala. Code § 13A–5–51(6) (1982). See also Ariz. Rev. Stat. Ann. § 13–702(E)(2) (Supp. 1988); Colo. Rev. Stat. § 16–11–103(5)(b) (1986 and Supp. 1988); Conn. Gen. Stat. § 53a–46a(g)(2) (1989); Fla. Stat. § 921.141(6)(f) (1987); Miss. Code Ann. § 99–19–101(6)(f) (Supp. 1988); Mo. Rev. Stat. § 565.032(3)(6) (1986); Mont. Code Ann. § 46–18–304(4) (1987); N. H. Rev. Stat. Ann. § 630:5 (II)(b)(4) (1986); N. M. Stat. Ann. § 31–20A–6(C) (1987); N. C. Gen. Stat. § 15A–2000(f)(6) (1988); 42 Pa. Cons. Stat. § 9711(e)(3) (1982); S. C. Code § 16–3–20(C)(b)(6) (1985); Va. Code § 19.2–264.4(B)(iv) (1983); Wyo. Stat. § 6–2–102(j)(vi) (1988).

[3] Ark. Code Ann. § 5–4–605(3) (1987); Cal. Penal Code Ann. § 190.3(h) (West 1988); Ky. Rev. Stat. Ann. § 532.025(2)(b)7 (Baldwin 1984); La. Code Crim. Proc. Ann., Art. 905.5(e) (West 1984); Neb. Rev. Stat. § 29–2523 (2)(g) (1985); N. J. Stat. Ann. § 2C: 11–3(c)(5)(d) (West Supp. 1988); Ohio Rev. Code Ann. § 2929.04(B)(3) (1987); Tenn. Code Ann. § 39–2–203(j)(8) (1982); Wash. Rev. Code § 10.95.070(6) (1987). Other formulations are used in Ind. Code § 35–50–2–9(c)(6) (1988); Md. Ann. Code, Art. 27, § 413 (g)(4) (1988); and Utah Code Ann. § 76–3–207(2)(d) (Supp. 1988).

as a mitigating circumstance in making the individualized determination whether death is the appropriate punishment in a particular case.

On the record before the Court today, however, I cannot conclude that all mentally retarded people of Penry's ability—by virtue of their mental retardation alone, and apart from any individualized consideration of their personal responsibility—inevitably lack the cognitive, volitional, and moral capacity to act with the degree of culpability associated with the death penalty. Mentally retarded persons are individuals whose abilities and experiences can vary greatly. As the AAMR's standard work, Classification in Mental Retardation, points out:

> "The term *mental retardation*, as commonly used today, embraces a heterogeneous population, ranging from totally dependent to nearly independent people. Although all individuals so designated share the common attributes of low intelligence and inadequacies in adaptive behavior, there are marked variations in the degree of deficit manifested and the presence or absence of associated physical handicaps, stigmata, and psychologically disordered states." Classification in Mental Retardation, at 12.

In addition to the varying degrees of mental retardation, the consequences of a retarded person's mental impairment, including the deficits in his or her adaptive behavior, "may be ameliorated through education and habilitation." Ellis & Luckasson, *supra*, at 424, n. 54. Although retarded persons generally have difficulty learning from experience, *Amici* Brief for AAMR et al. 7, some are fully "capable of learning, working, and living in their communities." *Id.*, at 6. See American Association on Mental Deficiency, Monograph 6, Lives in Process: Mildly Retarded Adults in a Large City (R. Edgerton ed. 1984). In light of the diverse capacities and life experiences of mentally retarded persons, it cannot be said on the record before us today that all mentally retarded

people, by definition, can never act with the level of culpability associated with the death penalty.

Penry urges us to rely on the concept of "mental age," and to hold that execution of any person with a mental age of seven or below would constitute cruel and unusual punishment. Tr. of Oral Arg. 22–25. Mental age is "calculated as the chronological age of nonretarded children whose average IQ test performance is equivalent to that of the individual with mental retardation." *Amici* Brief for AAMR et al. 14, n. 6. See D. Wechsler, The Measurement and Appraisal of Adult Intelligence 24–25 (4th ed. 1958). Such a rule should not be adopted today. First, there was no finding below by the judge or jury concerning Penry's "mental age." One of Penry's expert witnesses, Dr. Brown, testified that he estimated Penry's "mental age" to be 6½. App. 41. That same expert estimated that Penry's "social maturity" was that of a 9- or 10-year-old. *Ibid.* As a more general matter, the "mental age" concept, irrespective of its intuitive appeal, is problematic in several respects. As the AAMR acknowledges, "[t]he equivalence between nonretarded children and retarded adults is, of course, imprecise." *Amici* Brief for AAMR et al. 14, n. 6. The "mental age" concept may underestimate the life experiences of retarded adults, while it may overestimate the ability of retarded adults to use logic and foresight to solve problems. *Ibid.* The mental age concept has other limitations as well. Beyond the chronological age of 15 or 16, the mean scores on most intelligence tests cease to increase significantly with age. Wechsler 26. As a result, "[t]he average mental age of the average 20 year old is not 20 but 15 years." *Id.*, at 27. See also *In re Ramon M.*, 22 Cal. 3d 419, 429, 584 P. 2d 524, 531 (1978) ("[T]he 'mental age' of the average adult under present norms is approximately 16 years and 8 months").

Not surprisingly, courts have long been reluctant to rely on the concept of mental age as a basis for exculpating a defendant from criminal responsibility. See, *e. g., In re*

Ramon M., supra, at 429, 584 P. 2d, at 531; State v. Schilling, 95 N. J. L. 145, 148, 112 A. 400, 402 (1920); People v. Marquis, 344 Ill. 261, 267, 176 N. E. 314, 316 (1931); Chriswell v. State, 171 Ark. 255, 259, 283 S. W. 981, 983 (1926). Cf. Pickett v. State, 71 So. 2d 102, 107 (Ala. 1954). See generally Ellis & Luckasson, 53 Geo. Wash. L. Rev., at 435. Moreover, reliance on mental age to measure the capabilities of a retarded person for purposes of the Eighth Amendment could have a disempowering effect if applied in other areas of the law. Thus, on that premise, a mildly mentally retarded person could be denied the opportunity to enter into contracts or to marry by virtue of the fact that he had a "mental age" of a young child. In light of the inherent problems with the mental age concept, and in the absence of better evidence of a national consensus against execution of the retarded, mental age should not be adopted as a line-drawing principle in our Eighth Amendment jurisprudence.

In sum, mental retardation is a factor that may well lessen a defendant's culpability for a capital offense. But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person of Penry's ability convicted of a capital offense simply by virtue of his or her mental retardation alone. So long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination whether "death is the appropriate punishment" can be made in each particular case. While a national consensus against execution of the mentally retarded may someday emerge reflecting the "evolving standards of decency that mark the progress of a maturing society," there is insufficient evidence of such a consensus today.

Accordingly, the judgment below is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I agree that the jury instructions given at sentencing in this case deprived petitioner of his constitutional right to have a jury consider all mitigating evidence that he presented before sentencing him to die. I would also hold, however, that the Eighth Amendment prohibits the execution of offenders who are mentally retarded and who thus lack the full degree of responsibility for their crimes that is a predicate for the constitutional imposition of the death penalty.

I

I dissented in *Teague* v. *Lane*, 489 U. S. 288, 326 (1989), and I continue to believe that the plurality's unprecedented curtailment of the reach of the Great Writ in that case was without foundation. The *Teague* plurality adopted for no adequate reason a novel threshold test for federal review of state criminal convictions that, subject to narrow exceptions, precludes federal courts from considering a vast array of important federal questions on collateral review, and thereby both prevents the vindication of personal constitutional rights and deprives our society of a significant safeguard against future violations. In this case, the Court compounds its error by extending *Teague*'s notion that new rules will not generally be announced on collateral review to cases in which a habeas petitioner challenges the constitutionality of a capital sentencing procedure. This extension means that a person may be killed although he or she has a sound constitutional claim that would have barred his or her execution had this Court only announced the constitutional rule before his or her conviction and sentence became final. It is intolerable that the difference between life and death should turn on such a fortuity of timing, and beyond my comprehension that a majority of this Court will so blithely allow a State to take a human life though the method by which sentence was determined violates our Constitution.

I say the Court takes this step "blithely" advisedly. The Court extends *Teague* without the benefit of briefing or oral argument. *Teague*, indeed, was decided only after we had heard argument in this case. Rather than postponing decision on the important issue whether *Teague* should be extended to capital cases until it is presented in a case in which it may be briefed and argued, the Court rushes to decide *Teague*'s applicability in such circumstances here. It does so in two sentences, *ante*, at 313–314, saying merely that not to apply *Teague* would result in delay in killing the prisoner and in a lack of finality. There is not the least hint that the Court has even considered whether different rules might be called for in capital cases, let alone any sign of reasoning justifying the extension. Such peremptory treatment of the issue is facilitated, of course, by the Court's decision to reach the *Teague* question without allowing counsel to set out the opposing arguments.

Though I believe *Teague* was wrongly decided, and the Court's precipitate decision to extend *Teague* to capital cases an error, nevertheless if these mistakes are to be made law I agree that the Court's discussion of the question whether the jury had an opportunity to consider Penry's mitigating evidence in answering Texas' three "special issues" does not establish a "new rule." I thus join Part II-B of the Court's opinion, and all of Parts I and III. I also agree that there is an exception to *Teague* so that new rules "prohibiting a certain category of punishment for a class of defendants because of their status or offense" may be announced in, and applied to, cases on collateral review. *Ante*, at 330. I thus join Part IV-A of the Court's opinion.

## II

A majority of the Court today reaffirms, in this case and in *Stanford* v. *Kentucky*, *post*, at 382 (O'CONNOR, J., concurring in part and concurring in judgment); *post*, at 393 (BRENNAN, J., dissenting), the well-established principle that

"application of the death penalty to particular categories of crimes or classes of offenders violates the Eighth Amendment [if] it 'makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering' or [if] it is 'grossly out of proportion to the severity of the crime.'" *Ante*, at 335 (opinion of O'CONNOR, J.), quoting *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977). The contours of these two inquiries are clear. We gauge whether a punishment is disproportionate by comparing "the gravity of the offense," understood to include not only the injury caused, but also the defendant's moral culpability, with "the harshness of the penalty." *Solem* v. *Helm*, 463 U. S. 277, 292 (1983). See *ante*, at 336; *Stanford, post*, at 382 (O'CONNOR, J., concurring in part and concurring in judgment); *post*, at 393–394 (BRENNAN, J., dissenting); *Thompson* v. *Oklahoma*, 487 U. S. 815, 834 (1988) (plurality opinion); *id.*, at 853 (opinion of O'CONNOR, J.); *Coker, supra*, at 598; *Enmund* v. *Florida*, 458 U. S. 782, 798 (1982) (opinion of the Court); *id.*, at 815 (O'CONNOR, J., dissenting). And we require that a punishment further the penal goals of deterrence or retribution. *Ante*, at 335–336; *Stanford, post*, at 403 (BRENNAN, J., dissenting); *Thompson, supra*, at 836 (plurality opinion); *Enmund, supra*, at 798; *Coker, supra*, at 592; *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). In my view, execution of the mentally retarded is unconstitutional under both these strands of Eighth Amendment analysis.

## A

I agree with JUSTICE O'CONNOR that one question to be asked in determining whether the execution of mentally retarded offenders is always unconstitutional because disproportionate is whether the mentally retarded as a class "by virtue of their mental retardation alone, . . . inevitably lack the cognitive, volitional, and moral capacity to act with the

degree of culpability associated with the death penalty."
*Ante*, at 338. JUSTICE O'CONNOR answers that question in
the negative, "[i]n light of the diverse capacities and life ex-
periences of mentally retarded persons." *Ibid.* It seems to
me that the evidence compels a different conclusion.

For many purposes, legal and otherwise, to treat the men-
tally retarded as a homogeneous group is inappropriate,
bringing the risk of false stereotyping and unwarranted dis-
crimination. See Ellis & Luckasson, Mentally Retarded
Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 427 (1985).
Nevertheless, there are characteristics as to which there is
no danger of spurious generalization because they are a part
of the clinical definition of mental retardation. "Mental re-
tardation" is defined by the American Association on Mental
Retardation (AAMR) as "significantly subaverage general
intellectual functioning existing concurrently with deficits in
adaptive behavior and manifested during the developmental
period." AAMR, Classification in Mental Retardation 11
(H. Grossman ed. 1983) (hereafter AAMR Classification).
To fall within this definition, an individual must be among the
approximately two percent of the population with an IQ
below 70 on standardized measures of intelligence, see *id.*, at
31, and *in addition* must be subject to "significant limitations
in [his or her] effectiveness in meeting the standards of matu-
ration, learning, personal independence, and/or social respon-
sibility that are expected for his or her age level and cultural
group," *id.*, at 11; see also *id.*, at 76 (noting "the imperfect
correlation of intelligence and adaptive behavior, especially
at the upper ends of the intellectual range of retardation").
Thus, while as between the mildly, moderately, severely, and
profoundly mentally retarded, with IQs ranging from 70 to
below 20, there are indeed "marked variations in the degree
of deficit manifested," it is also true that "*all* individuals [des-
ignated as mentally retarded] share the common attributes of

low intelligence and inadequacies in adaptive behavior." *Id.*, at 12 (emphasis added).[1]

In light of this clinical definition of mental retardation, I cannot agree that the undeniable fact that mentally retarded persons have "diverse capacities and life experiences," *ante*, at 338, is of significance to the Eighth Amendment proportionality analysis we must conduct in this case. "Every individual who has mental retardation"—irrespective of his or her precise capacities or experiences—has "a substantial disability in cognitive ability and adaptive behavior." Brief for the AAMR et al. as *Amici Curiae* 5 (hereafter AAMR Brief). This is true even of the "highest functioning individuals in the 'mild' retardation category," *id.*, at 14, and of course of those like Penry whose cognitive and behavioral disabilities place them on the borderline between mild and moderate retardation. See *ante*, at 307–308, and n. 1. Among the mentally retarded, "reduced ability is found in every dimension of the individual's functioning, including his language, communication, memory, attention, ability to control impulsivity, moral development, self-concept, self-perception, suggestibility, knowledge of basic information, and general motivation." AAMR Brief 6. Though individuals, particularly those who are mildly retarded, may be quite capable of overcoming these limitations to the extent of being able to "main-

---

[1] It is of course possible to classify those with developmental disabilities in different ways. Indeed, the question on which certiorari was granted in this case—whether it violates the Eighth Amendment "to execute an individual with the reasoning capacity of a seven year old"—concerned classification according to mental age. Petitioner conflates mental age and the AAMR's mental retardation classifications in his brief, and the Court addresses both proposals for Eighth Amendment line drawing. JUSTICE O'CONNOR's opinion does not, however, preclude the possibility that an Eighth Amendment line might be drawn using a classification that encompasses only a more substantially disabled group than all those within the AAMR's clinical definition of the mentally retarded, and that lacks the problems JUSTICE O'CONNOR associates with the concept of mental age, *ante*, at 338–340.

tain themselves independently or semi-independently in the community," AAMR Classification 184; see *id.*, at 207–208, nevertheless, the mentally retarded by definition "have a reduced ability to cope with and function in the everyday world." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 442 (1985). The impairment of a mentally retarded offender's reasoning abilities, control over impulsive behavior, and moral development in my view limits his or her culpability so that, whatever other punishment might be appropriate, the ultimate penalty of death is always and necessarily disproportionate to his or her blameworthiness and hence is unconstitutional.[2]

Even if mental retardation alone were not invariably associated with a lack of the degree of culpability upon which death as a proportionate punishment is predicated, I would still hold the execution of the mentally retarded to be unconstitutional. If there are among the mentally retarded exceptional individuals as responsible for their actions as persons who suffer no such disability, the individualized consideration afforded at sentencing fails to ensure that they are the only mentally retarded offenders who will be picked out to receive a death sentence. The consideration of mental retardation as a mitigating factor is inadequate to guarantee, as the Con-

---

[2] Because a person's "mental age" is a factor only of his or her IQ and of the average IQs of nonretarded children, see *ante*, at 339, it is a less sophisticated and reliable guide to an individual's abilities than the accepted standards for diagnosing mental retardation, and must be supplemented with estimates of a person's "social maturity" measured in comparison to that of nonretarded children. In the present case, for example, there was testimony that petitioner had a mental age of 6½ and a social maturity equivalent to that of a 9- or 10-year-old. This evidence surely gives some insight into just what it is that Texas has proposed to do in killing Penry. However, "[t]he equivalence between nonretarded children and retarded adults is . . . imprecise," AAMR Brief 14, n. 6, and it seems on the basis of the information before us to be more appropriate to conduct proportionality analysis by reference to the accepted clinical classification of mental retardation than on the basis of age comparisons.

stitution requires, that an individual who is not fully blameworthy for his or her crime because of a mental disability does not receive the death penalty.

That "sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence" provides no assurance that an adequate individualized determination of whether the death penalty is a proportionate punishment will be made at the conclusion of each capital trial. *Ante*, at 340. At sentencing, the judge or jury considers an offender's level of blameworthiness only along with a host of other factors that the sentencer may decide outweigh any want of responsibility. The sentencer is free to weigh a mentally retarded offender's relative lack of culpability against the heinousness of the crime and other aggravating factors and to decide that even the most retarded and irresponsible of offenders should die. Indeed, a sentencer will entirely discount an offender's retardation as a factor mitigating against imposition of a death sentence if it adopts this line of reasoning:

> "It appears to us that there is all the more reason to execute a killer if he is also . . . retarded. Killers often kill again; [a] retarded killer is more to be feared than a . . . normal killer. There is also far less possibility of his ever becoming a useful citizen." Upholding Law and Order, Hartsville Messenger, June 24, 1987, p. 5B, col. 1 (approving death sentence imposed on mentally retarded murderer by a South Carolina court).

Lack of culpability as a result of mental retardation is simply not isolated at the sentencing stage as a factor that determinatively bars a death sentence; for individualized consideration at sentencing is not designed to ensure that mentally retarded offenders are not sentenced to death if they are not culpable to the degree necessary to render execution a proportionate response to their crimes. When Johnny Penry is resentenced, absent a change in Texas law there will be nothing to prevent the jury, acting lawfully, from

sentencing him to death once again—even though it finds his culpability significantly reduced by reason of mental retardation. I fail to see how that result is constitutional, in the face of the acknowledged Eighth Amendment requirement of proportionality.

B

There is a second ground upon which I would conclude that the execution of mentally retarded offenders violates the Eighth Amendment: killing mentally retarded offenders does not measurably further the penal goals of either retribution or deterrence. "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison* v. *Arizona*, 481 U. S. 137, 149 (1987); see also *Enmund*, 458 U. S., at 800. Since mentally retarded offenders as a class lack the culpability that is a prerequisite to the proportionate imposition of the death penalty, it follows that execution can never be the "just deserts" of a retarded offender, *id.*, at 801, and that the punishment does not serve the retributive goal, see *Stanford*, *post*, at 404 (BRENNAN, J., dissenting) ("A punishment that fails the Eighth Amendment test of proportionality because disproportionate to the offender's blameworthiness by definition is not justly deserved").

Furthermore, killing mentally retarded offenders does not measurably contribute to the goal of deterrence. It is highly unlikely that the exclusion of the mentally retarded from the class of those eligible to be sentenced to death will lessen any deterrent effect the death penalty may have for nonretarded potential offenders, for they, of course, will under present law remain at risk of execution. And the very factors that make it disproportionate and unjust to execute the mentally retarded also make the death penalty of the most minimal deterrent effect so far as retarded potential offenders are concerned. "[I]ntellectual impairments . . . in logical reasoning, strategic thinking, and foresight," the lack of the intellectual and developmental predicates of an "ability to

anticipate consequences," and "impairment in the ability to control impulsivity," AAMR Brief 6–7, mean that the possibility of receiving the death penalty will not in the case of a mentally retarded person figure in some careful assessment of different courses of action. See also *id.*, at 7 ("[A] person who has mental retardation often cannot independently generate in his mind a sufficient range of behaviors from which to select an action appropriate to the situation he faces (particularly a stressful situation)"). In these circumstances, the execution of mentally retarded individuals is "nothing more than the purposeless and needless imposition of pain and suffering," *Coker*, 433 U. S., at 592, and is unconstitutional under the Eighth Amendment.

Because I believe that the Eighth Amendment to the United States Constitution stands in the way of a State killing a mentally retarded person for a crime for which, as a result of his or her disability, he or she is not fully culpable, I would reverse the judgment of the Court of Appeals in its entirety.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, concurring in part and dissenting in part.

As I stated in my separate opinion in *Teague* v. *Lane*, 489 U. S. 288, 318–319, and n. 2 (1989), it is neither logical nor prudent to consider a rule's retroactive application before the rule itself is articulated. Nor am I at all sure that courts should decide the retroactivity issue if it was not raised below. Cf. *Zant* v. *Moore*, 489 U. S. 836, 837 (1989) (BLACKMUN, J., dissenting). Finally, I do not support the Court's assertion, without benefit of argument or briefing on the issue, that *Teague*'s retroactivity principles pertain to capital cases. Cf. *Teague*, 489 U. S., at 321, and n. 3 (STEVENS, J., concurring in part and concurring in judgment). But assuming, *arguendo*, that those principles do apply, it is clear that the Court's discussion of the mitigating evidence question, with which I agree, does not establish a "new rule"

as that term is used for retroactivity purposes. I thus join Parts I, II–B, and III.

In Part IV–A the Court decides that a rule that the Eighth Amendment prohibits the execution of a mentally retarded person ought to apply retroactively. Assuming retroactivity is pertinent, I agree that the first exception to Justice Harlan's nonretroactivity doctrine "should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense," *ante*, at 330, and that this claim lies within that exception.*

The remaining sections of Part IV adequately and fairly state the competing arguments respecting capital punishment of mentally retarded persons. In my judgment, however, that explication—particularly the summary of the arguments advanced in the Brief for American Association on Mental Retardation et al. as *Amici Curiae*, *ante*, at 336–337—compels the conclusion that such executions are unconstitutional. I would therefore reverse the judgment of the Court of Appeals in its entirety.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE KENNEDY join, concurring in part and dissenting in part.

I

I join Part I of the Court's opinion, setting forth the facts and procedural history of this case; Part II–A, holding that *Teague* v. *Lane*, 489 U. S. 288 (1989), which precludes collat-

---

*Because I believe that retroactivity should not be considered until after a right is established, see *Teague* v. *Lane*, 489 U. S. 288, 318–319, and n. 2 (1989) (STEVENS, J., concurring in part and concurring in judgment), the Court's rejection of this claim ordinarily would preclude me from agreeing even for purposes of argument that the rule Penry seeks may be applied retroactively. I do so here because the Court has fleshed out the merits of Penry's claim sufficiently to allow me to reach a contrary conclusion.

eral relief that would establish a "new rule," applies to capital sentencing; and Part IV–A, holding that the exception to *Teague* for a new rule that places certain matters "'beyond the power of the criminal law-making authority,'" *id.*, at 311, quoting *Mackey* v. *United States*, 401 U. S. 667, 692 (1971) (separate opinion of Harlan, J.), applies to petitioner's contention that the Eighth Amendment forbids the execution of mentally retarded offenders. I also join Part IV–B, rejecting the latter contention on the ground that execution of mentally retarded offenders contravenes neither those practices condemned at the time the Bill of Rights was adopted nor the "evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). Unlike JUSTICE O'CONNOR, however, I think we need go no further to resolve the Eighth Amendment issue. Part IV–C of her opinion goes on to examine whether application of the death penalty to mentally retarded offenders "violates the Eighth Amendment because it 'makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering' or because it is 'grossly out of proportion to the severity of the crime.'" *Ante*, at 335 (citations omitted). For the reasons explained by the plurality in *Stanford* v. *Kentucky*, *post*, p. 361, I think this inquiry has no place in our Eighth Amendment jurisprudence. "The punishment is either 'cruel *and* unusual' (*i. e.*, society has set its face against it) or it is not." *Post*, at 378 (emphasis in original). If it is not unusual, that is, if an objective examination of laws and jury determinations fails to demonstrate society's disapproval of it, the punishment is not unconstitutional even if out of accord with the theories of penology favored by the Justices of this Court. See *post*, at 379.

II

I disagree with the holding in Part II–B of the Court's opinion that petitioner's contention, that his sentencing was

unconstitutional because the Texas jury was not permitted
fully to consider and give effect to the mitigating evidence
of his mental retardation and background of abuse, does not
seek the application of a "new rule" and is therefore not
barred by *Teague*. I also disagree with the disposition of the
merits of this contention, in Part III of the Court's opinion.

### A

The merits of this mitigation issue, and the question
whether, in raising it on habeas, petitioner seeks application
of a "new rule" within the meaning of *Teague*, are obviously
interrelated. I will say only a few words addressed exclu-
sively to the latter. Our holding in *Teague* rested upon the
historic role of habeas corpus in our system of law, which is
to provide a "deterrence," "'the threat of [which] serves
as a necessary additional incentive for trial and appellate
courts throughout the land to conduct their proceedings in
a manner consistent with established constitutional stand-
ards.'" 489 U. S., at 306, quoting *Desist* v. *United States*,
394 U. S. 244, 262–263 (1969) (Harlan, J., dissenting). "De-
terrence" and "threat" are meaningless concepts as applied to
a situation in which the law is so uncertain that a judge acting
in all good faith and with the greatest of care could reason-
ably read our precedents as permitting the result the habeas
petitioner contends is wrong. Thus, a "new rule," for pur-
poses of *Teague*, must include not only a new rule that re-
places an old one, but a new rule that replaces palpable un-
certainty as to what the rule might be. We acknowledged as
much in *Teague* (in a passage given lip-service by the Court
today, see *ante*, at 314) when we said that "a case announces
a new rule if the result was not *dictated* by precedent existing
at the time the defendant's conviction became final." 489
U. S., at 301.

As my discussion of the merits will make plain, it chal-
lenges the imagination to think that today's result is "dic-
tated" by our prior cases. Indeed, if there is any available

contention that our prior cases *compelled* a particular result, it is the contention that petitioner's claim was considered and rejected by *Jurek* v. *Texas*, 428 U. S. 262 (1976). Even if that contention is rejected, however, there is *no* basis for finding a compulsion in the opposite direction. It seems to me utterly impossible to say that a judge acting in good faith and with care should have known the rule announced today, and that future fault similar to that of which the Texas courts have been guilty must be deterred by making good on the "threat" of habeas corpus.

In a system based on precedent and *stare decisis*, it is the tradition to find each decision "inherent" in earlier cases (however well concealed its presence might have been), and rarely to replace a previously announced rule with a new one. If *Teague* does not apply to a claimed "inherency" as vague and debatable as that in the present case, then it applies only to habeas requests for plain overruling—which means that it adds little if anything to the principles already in place concerning the retroactivity of new rules in criminal cases, which provide that "a decision announcing a new standard 'is almost automatically nonretroactive' where the decision 'has explicitly overruled past precedent.'" *Allen* v. *Hardy*, 478 U. S. 255, 258 (1986), quoting *Solem* v. *Stumes*, 465 U. S. 638, 646, 647 (1984). It is rare that a principle of law as significant as that in *Teague* is adopted and gutted in the same Term.

### B

I turn next to the merits of petitioner's mitigation claim. In *Furman* v. *Georgia*, 408 U. S. 238 (1972), we invalidated Georgia's capital punishment scheme on the ground that, since there were no standards as to when it would be applied for a particular crime, it created too great a risk that the death penalty would be irrationally imposed. Four years later, however, we struck down the capital sentencing schemes of North Carolina and Louisiana for the opposite vice—because they unduly *constricted* sentencing discretion

by failing to allow for individualized consideration of the particular defendant and offense, see *Woodson* v. *North Carolina*, 428 U. S. 280 (1976); *Roberts* v. *Louisiana*, 428 U. S. 325 (1976). On the same day, however, we upheld the schemes of Georgia, Texas, and Florida, because they struck the proper balance, channeling the sentencer's discretion without unduly restricting it. *Gregg* v. *Georgia*, 428 U. S. 153 (1976); *Jurek* v. *Texas, supra; Proffitt* v. *Florida*, 428 U. S. 242, 253 (1976). The Texas system upheld in *Jurek* was precisely the same one the Court finds unacceptable today, which structures the jury's discretion through three questions relating to the defendant's personal culpability for the crime, his future dangerousness, and the reasonableness of his response to any provocation by the victim. In holding that this scheme unconstitutionally limits the jury's discretion to consider the mitigating evidence of Penry's mental retardation and abused childhood, the Court today entirely disregards one of the two lines of our concern, requiring individualized consideration to displace the channeling of discretion, and throwing away *Jurek* in the process.

The Court contends that its conclusion is not inconsistent with *Jurek* because that case merely upheld a facial challenge to the Texas Special Issues framework. According to the Court, it did not "preclud[e] a claim that, in a particular case, the jury was unable to fully consider the mitigating evidence introduced by a defendant in answering the special issues." *Ante,* at 321. I disagree. While rejection of a facial challenge to a statute does not preclude all as-applied attacks, surely it precludes one resting upon the same asserted principle of law. And that is the situation here. The joint opinion announcing the judgment in *Jurek* (it is necessary only to describe the joint opinion, since the three Justices subscribing to the opinion of JUSTICE WHITE, 428 U. S., at 277, would have upheld the Texas statute on even broader grounds) said that "the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of

particularized mitigating factors." *Id.*, at 272. The claim that the Court entertains and vindicates today flatly contradicts that analysis, holding that the constitutionality turns on whether the questions allow mitigating factors not only to be considered (and, of course, given effect in answering the questions), *but also to be given effect in all possible ways, including ways that the questions do not permit.* It is simply not true that, as today's opinion asserts, the *Jurek* Court had before it "the express assurance that the special issues would permit the jury to fully consider all the mitigating evidence a defendant introduced." *Ante*, at 321. What the Court means by "fully consider" (what it *must* mean to distinguish *Jurek*) is to consider *for all purposes, including purposes not specifically permitted by the questions.* But there was no such assurance at all. To the contrary, the portion of the Texas Court of Criminal Appeals' opinion quoted in *Jurek* to evidence the assurance began: "'In determining the likelihood that the defendant would be a continuing threat to society [*i. e.*, in considering the second question under the Texas statute], the jury could consider . . . [,]'" 428 U. S., at 272–273, quoting 522 S. W. 2d 934, 939–940 (1975). The same focus upon the use of mitigating evidence for the limited purpose of answering the enumerated questions, rather than upon the jury's ability to use it for all purposes, is also evident in the joint opinion's statement that "[the] Texas Court of Criminal Appeals has not yet construed the first and third questions . . . ; thus it is as yet undetermined whether or not the jury's *consideration of those questions* would properly include consideration of mitigating circumstances." 428 U. S., at 272, n. 7 (emphasis added).

In short, it could not be clearer that *Jurek* adopted the constitutional rule that the instructions had to render all mitigating circumstances relevant to the jury's verdict, but that the precise manner of their relevance—the precise *effect* of their consideration—could be channeled by law. The joint opinion approved the Texas statute expressly because it "focuses the

jury's objective consideration of the particularized circumstances of the individual offense and the individual offender." *Id.*, at 274. Of course there remains available, in an as-applied challenge to the Texas statute, the contention that a particular mitigating circumstance is in fact irrelevant to any of the three questions it poses, and hence could not be considered. But that is not the case here, nor is it the ground upon which the Court relies. Special Issue One required the jury to determine whether " 'the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.' " *Ante*, at 310. As the plurality observed in *Franklin* v. *Lynaugh*, 487 U. S. 164 (1988), "[t]he Texas courts have consistently held that something more must be found in the penalty phase—something beyond the guilt-phase finding of 'intentional' commission of the crime—before the jury can determine that a capital murder is 'deliberate' within the meaning of the first Special Issue." *Id.*, at 171–175 (citing Texas cases). Evidence of Penry's mental retardation and abused childhood was relevant to that point. He was permitted to introduce all that evidence, relied upon it in urging the jury to answer "no" to the Special Issues, and had the benefit of an instruction specifically telling the jury to consider all evidence for that purpose. See App. 26. Thus, the only available contention here, and the basis on which the Court decides the case, is that this evidence "has relevance to . . . moral culpability beyond the scope of the special issues." *Ante*, at 322. That contention was considered and rejected by *Jurek*'s holding that the statute's "focus[ing of] the jury's objective consideration" was constitutional. 428 U. S., at 274.

But even if petitioner's claim is not foreclosed by *Jurek*, the Court clearly errs in asserting that our later precedents "compe[l]" the conclusion that it is valid, *ante*, at 328. While it is true that our cases have held that "a death penalty statute must not preclude consideration of relevant mitigating

factors," including "any aspect of a defendant's character or record and any of the circumstances of the offense," *Lockett* v. *Ohio*, 438 U. S. 586, 604, 608, (1978); see also *Eddings* v. *Oklahoma*, 455 U. S. 104, 110–112 (1982), we have never held that "the State has no role in structuring or giving shape to the jury's consideration of these mitigating factors." *Franklin*, *supra*, at 179. As JUSTICE STEVENS pointed out in *Barclay* v. *Florida*, 463 U. S. 939 (1983), neither *Lockett* nor *Eddings* "establish[ed] the weight which must be given to any particular mitigating evidence, or the manner in which it must be considered; they simply condemn any procedure in which such evidence has no weight at all." 463 U. S., at 961, n. 2 (opinion concurring in judgment). See also *Zant* v. *Stephens*, 462 U. S. 862, 875–876, n. 13 (1983) ("[S]pecific standards for balancing aggravating against mitigating circumstances are not constitutionally required").

We have held that a State may not make the death penalty mandatory, see *Sumner* v. *Shuman*, 483 U. S. 66 (1987); *Woodson*, 428 U. S. 280 (1976); *Roberts*, 428 U. S. 325 (1976), and that it may not affirmatively preclude a sentencer from considering mitigating evidence presented by a defendant, see *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987); *Skipper* v. *South Carolina*, 476 U. S. 1 (1986). The sentences in *Eddings* and *Lockett*, the cases upon which the Court principally relies, ran afoul of the latter rule—*Eddings* because the sentencing judge thought Oklahoma law categorically prevented him from considering certain mitigating evidence, and *Lockett* because Ohio law limited the mitigating factors to three, which on their face would not embrace even such rudimentary elements as lack of intent to kill the victim, the defendant's comparatively minor role in the offense, and age. As we noted in *Jurek* and the Court does not contest today, Texas permits *all* mitigating factors to be considered, though only for purposes of answering the three Special Issues (and there is no question that the specific mitigation offered was relevant to at least one of them). That is why the *Lockett*

Court found the Texas statute "significantly different" from the Ohio scheme. 438 U. S., at 607. And that is why we have continued to say, after *Eddings* and *Lockett*, that the Texas Special Issues "allo[w] the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion." *Lowenfield* v. *Phelps*, 484 U. S. 231, 245 (1988). See also *Pulley* v. *Harris*, 465 U. S. 37, 48–49 (1984); *Zant* v. *Stephens, supra,* at 875–876, n. 13; *Adams* v. *Texas,* 448 U. S. 38, 46 (1980). I acknowledge that some statements in *Lockett* and *Eddings,* read in isolation from the facts of the cases, might be thought to establish the principle that the Court today adopts. One must read cases, however, not in a vacuum, but in light of their facts—which, in conjunction with the clear and constant reaffirmation of *Jurek,* leads to the conclusion that all mitigating factors must be able to be considered by the sentencer, but need not be able to be considered for all purposes.

Finally, I turn briefly to the place of today's holding within the broad scheme of our constitutional jurisprudence regarding capital sentencing, as opposed to the immediately applicable precedents. It is out of order there as well. As noted at the outset of this discussion, our law regarding capital sentencing has sought to strike a balance between complete discretion, which produces "wholly arbitary and capricious action," *Gregg,* 428 U. S., at 189, and no discretion at all, which prevents the individuating characteristics of the defendant and of the crime to be taken into account, *Woodson, supra,* at 303–304. That is why, in *Jurek,* we did not regard the Texas Special Issues as inherently bad, but to the contrary thought them a desirable means of "focus[ing] the jury's objective consideration of the particularized circumstances," 428 U. S., at 274, or, as the plurality put it in *Franklin,* "channel[ing] jury discretion . . . to achieve a more rational and equitable administration of the death penalty," 487 U. S., at 181. In providing for juries to consider all

mitigating circumstances insofar as they bear upon (1) deliberateness, (2) future dangerousness, and (3) provocation, it seems to me Texas had adopted a rational scheme that meets the two concerns of our Eighth Amendment jurisprudence. The Court today demands that it be replaced, however, with a scheme that simply dumps before the jury all sympathetic factors bearing upon the defendant's background and character, and the circumstances of the offense, so that the jury may decide without further guidance whether he "lacked the moral culpability to be sentenced to death," *ante*, at 324, "did not deserve to be sentenced to death," *ante*, at 326, or "was not sufficiently culpable to deserve the death penalty," *ibid*. The Court seeks to dignify this by calling it a process that calls for a "reasoned moral response," *ante*, at 323, 328—but reason has nothing to do with it, the Court having eliminated the structure that required reason. It is an unguided, emotional "moral response" that the Court demands be allowed— an outpouring of personal reaction to all the circumstances of a defendant's life and personality, an unfocused sympathy. Not only have we never before said the Constitution requires this, but the line of cases following *Gregg* sought to eliminate precisely the unpredictability it produces. See, *e. g., Godfrey* v. *Georgia*, 446 U. S. 420, 428 (1980) (States "must channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death'") (citations omitted); *California* v. *Brown*, 479 U. S. 538, 541 (1987) ("[S]entencers may not be given unbridled discretion in determining the fates of those charged with capital offenses"; the "Constitution . . . requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion").

The Court cannot seriously believe that rationality and predictability can be achieved, and capriciousness avoided, by " 'narrow[ing] a sentencer's discretion to *impose* the death

sentence,'" but expanding his discretion "'to *decline to impose* the death sentence,'" *ante*, at 327, quoting *McCleskey* v. *Kemp*, 481 U. S. 279, 304 (1987) (emphasis in original). The decision whether to impose the death penalty is a unitary one; unguided discretion not to impose is unguided discretion to impose as well. In holding that the jury had to be free to deem Penry's mental retardation and sad childhood relevant for whatever purpose it wished, the Court has come full circle, not only permitting but requiring what *Furman* once condemned. "Freakishly" and "wantonly," *Furman*, 408 U. S., at 310 (Stewart, J. concurring), have been rebaptized "reasoned moral response." I do not think the Constitution forbids what the Court imposes here, but I am certain it does not require it.

I respectfully dissent.