Timothy L. **GRIBBLE**

v.

Gary L. **JOHNSON**, Director, Texas Department of Criminal Justice, Institutional Division.

Civil Action No. G–98–032.

United States District Court, S.D. Texas, Galveston Division.

June 25, 1998.

---

Thomas W. McQuage, Greer Herz & Adams, Galveston, TX, Jack D Ewing, Jr, Texas City, TX, for Petitioner.

Timothy L. Gribble, Huntsville, TX, pro se.

Gena A. Blount, Office of Attorney General, Austin, TX, for Respondent.

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING SUMMARY JUDGMENT

KENT, District Judge.

Now before the Court is Timothy L. Gribble's Amended Petition for Writ of Habeas Corpus (the "Petition"), filed May 22, 1998, and Respondent's Amended Motion for Summary Judgment, filed June 17, 1998. For the reasons set forth below, the Amended Petition is **DENIED**, and Respondent's Motion for Summary Judgment is **GRANTED**.

### I. PROCEDURAL BACKGROUND OF THE CASE

Gribble was indicted on October 14, 1987 in the 122nd Judicial District Court of Galveston County, Texas for the capital offense of murdering Elizabeth Jones in the course of committing and attempting to commit the offense of kidnapping. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 1986). The crime occurred on or about September 9, 1987. Gribble was tried before a jury upon a plea of not guilty. On April 23, 1992, the jury found Gribble guilty of the capital offense.[1] Six days later, on April 29, following a separate punishment hearing, the jury answered affirmatively the two special sentencing issues submitted pursuant to article 37.071(b) of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (Vernon 1991).[2] Accordingly, the trial court assessed the death penalty.

---

1. Gribble was previously tried and convicted for the same offense and sentenced to death; on direct appeal, the conviction was reversed by a plurality of the Texas Court of Criminal Appeals on the ground that evidence of Gribble's childhood abuse required a mitigation instruction under *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *See Gribble v. State*, 808 S.W.2d 65 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).

2. The special issues submitted to the jury were: (1) whether the defendant's conduct was committed deliberately and with the reasonable expectation that the victim's death would result; and (2) "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (Vernon 1991). Upon the jury's affirmative answer to both of these special issues, the trial court was required to sentence Gribble to death. *Id.* art. 37.071(e) (1991).

Gribble's conviction and sentence were affirmed by the Court of Criminal Appeals of Texas on February 1, 1995, *Gribble v. State,* No. 71,485 (Tex.Crim.App. Feb. 1, 1995), and the United States Supreme Court denied his Petition for Writ of Certiorari on October 2, 1995. *Gribble v. Texas,* 516 U.S. 831, 116 S.Ct. 105, 133 L.Ed.2d 58 (1995). The Texas Court of Criminal Appeals, adopting the district court's findings and conclusions, denied Petitioner's state application for Writ of Habeas Corpus on October 29, 1997. *Ex parte Gribble,* No. 34,968–02 (Tex.Crim.App. Feb. 2, 1998).

On January 9, 1998, the district court scheduled Gribble's execution for April 22, 1998. On January 20, 1998, Gribble filed in this Court a *pro se* motion for appointment of counsel pursuant to 21 U.S.C. § 848 and Motion for Stay of Execution. On January 26, 1998, the Court denied the Motion for Stay as premature, and ordered Gribble to proceed *in forma pauperis* in order to demonstrate indigence. Upon receiving Gribble's application to proceed *in forma pauperis,* the Court appointed Thomas McQuage and Jack Ewing to represent Gribble on March 4, 1998. On April 13, 1998, this Court granted Gribble's Unopposed Second Motion to Stay his scheduled execution date of April 22, 1998,[3] pending a resolution of the claims presented in his first federal habeas corpus petition.

## II. FACTUAL BACKGROUND OF THE CASE [4]

On September 8, 1987, Elizabeth Jones disappeared. Ms. Jones lived alone in a house in Clear Lake Shores, Texas, near the IBM facility where she worked as a manager on the NASA shuttle project. On the evening of September 8, 1987, at about 7:30, Jones called her boyfriend Terry Hahn and told him that she was not feeling well and planned to go to bed early. Jones was in the midst of remodeling her home, and told Hahn that a roofer was still there working on the roof over her bedroom. After Jones

failed to show up for work the following day, her boss, Barry Eiland, and her exhusband, Greg Miller, went to her house to check on her. They found the doors locked, her car parked in her driveway, but no one home. They broke into her house and found no evidence of forced entry or a struggle, and found that only her purse and her bathrobe were missing. Police investigators also searched the house, and found numerous cigarette butts and ashes around the house, as well as an almost empty bottle of wine in the trash can.

Police learned from the contractor performing the work on Jones's house that Timothy Gribble was the person who had been working on Jones's roof on the evening she disappeared. Realizing that Gribble may have been the last person to see Jones before she disappeared, the police questioned Gribble about her disappearance, although he was not considered a suspect at the time. Gribble told police that after completing the day's work, he had knocked on Jones's door and told her he would return the following morning to complete the job. He claimed that Jones allowed him to enter her house so that he could wash his hands, and then he left.

Despite continued search efforts during the next couple of weeks, Jones's friends were unable to locate her. Jones's exhusband hired a private detective agency to assist in the investigation. On September 14, 1987, the Clear Lake Shores Police Department decided to treat the disappearance as a criminal investigation rather than a missing person report. On September 21 and 22, 1987, police and private investigators questioned Gribble again about Jones's disappearance. At that time, Gribble admitted to be the source of the cigarette butts and wine bottle found in Jones's home, but still refused to acknowledge any involvement in her disappearance. After the questioning, Gribble became a prime suspect in the disappearance.

---

**3.** The self-styled "Second Motion to Stay Execution" was actually Gribble's third Motion to Stay his execution; the second was filed on March 10, 1998. The Court denied that Motion on March 27, 1998 because Gribble failed to meet the requirements for granting a stay.

**4.** The following facts are based on the Petition, Respondent's Answer, and the statement of facts as set out by the Texas Court of Criminal Appeals. *See Gribble v. State,* 808 S.W.2d 65, 67–68 (Tex.Crim.App.1990).

Several days after he was questioned the second time, Gribble fled from Texas to Tennessee, where he stayed with relatives. On September 30, 1987, Gribble was arrested and jailed in Tennessee on unrelated charges. Texas Ranger Joe Haralson and Galveston County Deputy Wayne Kessler, both assigned to investigate the Jones disappearance, traveled to Tennessee on October 2 to extradite Gribble to Texas on other unrelated charges. After arriving at the Harris County Sheriff's Department in Houston, Gribble was advised of his rights and again questioned about the Jones case. After two days of interrogation, Gribble finally confessed to the sexual assault, kidnapping, and murder by strangulation of Elizabeth Jones.

According to his statement, Gribble returned to Jones's house later in the evening of September 8, claiming that he had left his wallet there. On that pretense, Jones allowed Gribble to enter her home. Gribble stated that he pulled Jones into the bedroom and forced her to have sex with him. According to Gribble's version of the events, Jones was reluctant at first, but eventually consented to the sex. Gribble claims that he fell asleep on Jones's bed, and when he woke up he begged her to not tell anyone about the incident. When Jones told Gribble that she would have to report the sexual assault to the police, Gribble forced Jones into his truck, wearing only her bathrobe. He drove around various county roads aimlessly for about an hour, until he found a dark and desolate area near League City.

At that point, Gribble claims that his only intention was to tie Jones to a tree so that he would have time to spend with his wife and stepchildren and leave town before she could report him to the police. When Gribble told Jones of his intentions, she began to cry out and scream for help. Gribble then took the sash of Jones's bathrobe, tied it around her throat, and strangled her until she was dead. He dragged her body a short distance and left her body lying under a tree, covered with brush. Gribble then returned to his truck and found Jones's purse, which he filled with rocks and threw into a nearby lake.

After making his recorded statement, Gribble drew a map to show police where Jones's body could be found. Thereafter, he led officers to the lake where he had thrown the purse, and to the location of Jones's body, which was in an advanced state of decomposition, the robe sash still wrapped around her neck. Elizabeth Jones's body and her purse were found in the exact locations described by Gribble.

## III. STANDARD OF REVIEW

■ When ruling on a motion for summary judgment, the evidence is viewed through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In this case, because Gribble's Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 (West 1994 & Supp.1998),[5] that prism differs depending upon whether the issue is one of law, fact, or both. *See Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).

■ For questions of fact, habeas relief may be granted only if the Court finds that the state court made a determination of fact that was unreasonable in light of the evidence presented to it. *See* 28 U.S.C. § 2254(d)(2); *Drinkard,* 97 F.3d at 767–68. When reviewing such factual determinations, the Court must presume correct the factual findings of the state court, unless the Petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Jackson v. Anderson,* 112 F.3d 823, 824–25 (5th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1059, 140 L.Ed.2d 120 (1998). When considering questions of law, on the other hand, this Court may grant habeas relief only if the state court's determination of law is contrary to "clearly established" Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *Drinkard,* 97 F.3d at 768. Habeas relief generally may not be premised on rules of constitutional law

**5.** The Fifth Circuit has determined that the AEDPA applies to cases where a petition for habeas corpus is filed on or after April 24, 1996. *See*

*Williams v. Cain,* 125 F.3d 269, 274 (5th Cir. 1997).

that have yet to be announced or that were announced after the challenged conviction became final. *See Teague v. Lane,* 489 U.S. 288, 305–08, 109 S.Ct. 1060, 1073–74, 103 L.Ed.2d 334 (1989). Finally, for mixed questions—that is, those containing issues of law and fact [6]—relief is granted only if the state court decision rests on an "unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), *i.e.,* when the state decision "is so clearly incorrect that it would not be debatable among reasonable jurists." *Drinkard,* 97 F.3d at 768, 769; *see Carter v. Johnson,* 110 F.3d 1098, 1106–08 (5th Cir.) (with a mixed question of law and fact, the facts are presumed correct and then the law is reviewed for reasonableness, not *de novo* ), *vacated on other grounds,* —— U.S. ——, 118 S.Ct. 409, 139 L.Ed.2d 313 (1997).

## IV. PETITIONER'S ASSERTED GROUNDS FOR RELIEF

### A. *Ground One:*

The conviction was obtained in violation of the [F]ourth and [F]ifth [A]mendments to the United States Constitution, because the petition was based in part on a statement given to a private investigator and to police officers who failed to give the Petitioner *Miranda* warnings, even though the statement was the product of a custodial interrogation.

▮ In his first point of error, Petitioner argues that, because his conviction was based in part on the statement he gave police on September 21, 1987, and because he did not receive any *Miranda* warnings on that date, his conviction must be overturned.

In *Miranda v. Arizona,* the Supreme Court established a procedural mechanism designed to safeguard the exercise of the Fifth Amendment privilege against self-incrimination by requiring law enforcement officials to inform the suspect of certain rights before questioning a suspect in custody. 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966). These *Miranda* warn-

ings are required only when a suspect is both in custody and subjected to interrogation. *Id.* at 477–78, 86 S.Ct. at 1629–30. "Custody" for *Miranda* purposes means the deprivation of freedom of action in any significant way. *Id.* at 444, 86 S.Ct. at 1612. In making the determination of whether a suspect was in custody, courts must consider the totality of the circumstances, asking "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

In this case the Court of Criminal Appeals found, on direct appeal of Gribble's conviction and sentence, that Gribble was not in custody when he gave these statements, and therefore *Miranda* was not implicated. Because this claim presents a mixed question of law and fact, the Court asks whether the state court's decision was an unreasonable application of the law. The record shows that on the occasion complained of, September 21, 1987, Gribble voluntarily went to the police station to take a polygraph test. The record shows that he told a police sergeant a couple of times that he was uncomfortable with taking the test. Both times, the officer assured Gribble that the polygraph test was voluntary and that he was under no obligation to take the examination, and that it could be delayed for as long as Gribble desired, or abandoned altogether. The officer also encouraged Gribble to consult with an attorney, and stressed that he was neither in custody nor under arrest. Based on those facts, the Court finds that the Court of Criminal Appeals was reasonable in its finding that Gribble was not in custody when he gave the September 21 statement.

▮ Moreover, even assuming that Petitioner was in custody when the statement was given, the Fifth Circuit has addressed the effect of such "un-Mirandized" prior statements, finding that:

*Miranda* merely created a prophylactic rule that establishes an irrebuttable pre-

---

**6.** A mixed question of law and fact has been defined as a question "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982).

sumption of involuntariness with respect to statements made during custodial interrogation that are not preceded by *Miranda* warnings. Mirandized statements made subsequent to an un-Mirandized statement are not the illegal fruit of the prior statement unless the prior statement was actually involuntary as opposed to merely presumed involuntary on the basis that it was given without the benefit of *Miranda* warnings.

*United States v. Garcia Abrego,* 141 F.3d 142, 169 (5th Cir.1998) (citations omitted); *see also Oregon v. Elstad,* 470 U.S. 298, 310–11, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222 (1985) (in circumstances where the prior unwarned statement was voluntary, "a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible"). In this case, the record clearly establishes that Gribble was repeatedly assured that the polygraph was voluntary and that he was free to leave at any time. Gribble does not argue otherwise. Thus, even if he was in custody, the un-Mirandized statement has absolutely no effect on the statement ultimately relied upon for Gribble's conviction, because there is no evidence that it was "actually involuntary."

Accordingly, Petitioner's Ground One is **DENIED**.

**B.** *Ground Two*

The conviction was obtained in violation of Petitioner's right against self-incrimination under the [F]ifth [A]mendment to the United States Constitution because the interrogating police officers refused to terminate the interrogation upon Petitioner's request.

█ Petitioner's next claim is that the officers' refusal to terminate the interview upon his request rendered his tape-recorded statement inadmissible at trial. On October 3, 1987, after being fully advised of his *Miranda* rights and waiving them, Gribble gave his statement to officers confessing to the murder of Elizabeth Jones. During the confession, Gribble asked the officers, "Can we stop for just a second?" Petitioner contends that this statement was a request to terminate the interrogation, and that the officers proceeded with the questioning in violation of Petitioner's Fifth Amendment rights.

During Gribble's second trial, the trial court conducted a hearing outside the presence of the jury on Gribble's motion to suppress the tape-recorded statement. The trial court found that Gribble's question to the officers during the confession was not a request to terminate the interview or to remain silent, but was a request that the tape recorder be momentarily turned off because Gribble was feeling ill. The Court of Criminal Appeals found support in the record for the trial court's finding that Gribble's request was for a momentary pause to recompose himself, not a request to terminate the interview.[7] The Court finds that the state court finding, that Gribble's request to stop the interview "for just a second" was not a request to terminate the interview altogether, is factually justified, and reasonable in light of the evidence presented. Petitioner has presented no clear and convincing evidence to rebut the presumption of correctness placed on the state court's findings of fact. *See* 28 U.S.C. § 2254(e)(1).

Accordingly, Petitioner's Ground Two is **DENIED**.

**C.** *Ground Three:*

The conviction was obtained in violation of Petitioner's right against self-incrimination under the [F]ifth [A]mendment to the United States Constitution because the interrogating police officers misled the Petitioner about the use of his confession against him in court.

█ Petitioner claims in Ground Three that the officers interrogating him at the time he gave his confession misled Gribble when he expressed concerns that his wife might hear the tape and that the tape could be played in open court. Petitioner claims that the officers "orchestrated a pattern of telling Petitioner what he wanted to hear in one instant, and then following with language that they believed would make the statement

---

7. Specifically, the state appeals court found that Petitioner's assertion of his right to terminate the interview was limited, and that his Fifth Amendment rights were not violated because "[i]f he wished to terminate the interview permanently, he could and should have so indicated."

admissible." · For instance, the officers told Gribble that they would not play the tape for his wife, and that the tape would not necessarily go to court if Gribble could "make a suitable arrangement with the state." However, as Petitioner concedes, the officers also told Gribble that "in the event this goes to trial, in the event you are indicted, and I anticipate that you will be, then you will be offered for trial and this tape will be used as evidence, and it will be an open court proceeding and anybody there, if it's played, will hear it, probably." SOF at 939. Furthermore, the officers reassured Gribble that "we are not trying to coerce you into doing this. We want you to do it. We are not trying to coerce you into doing it." To the latter statement, Gribble replied "I understand." SOF at 940.

Respondent argues first that Petitioner's claim is procedurally barred. Petitioner failed to raise this issue in his state court appeals; rather, he appealed only his claim that the warnings given to him prior to his statement did not comply with Article 38.22 of the Texas Code of Criminal Procedure. He did not appeal the violation of his Fifth Amendment rights due to the officer's allegedly misleading statements. Because Gribble did not raise this issue on direct appeal, he could only have it exhausted in a successive state habeas application if he met the requirements of TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a) (Vernon Supp.1998). Petitioner has not made a showing on any of these requirements; therefore, an attempt to file a successive state habeas petition would likely be foreclosed as an abuse of the writ. *See id.* § 5(c).

Furthermore, where a petitioner has failed to exhaust state remedies, and would meet a procedural bar if he attempted to exhaust those remedies, "there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims." *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991); *Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998). In other words, the state court does not have to explicitly apply the state procedural bar for federal habeas review to be foreclosed.

Although the Court does find that this claim is procedurally barred, in an abundance of caution, the claim is nevertheless analyzed on its merits.[8] The Court finds Petitioner's claim to be patently meritless. Petitioner does not dispute that he was read his Miranda warnings before he gave the statement; he merely argues that the officers' statements impermissibly compelled his statement. However, the record clearly shows that Gribble was informed that his statement could be used in open court if he were tried, that his wife may hear it if that were to happen, and again informed him that his statement was voluntary. The officers were honest and forthright when they informed Gribble what the tape might be used for, and that anybody might hear it. After hearing such statements, Gribble cannot claim that he was under any illusion that his wife would never hear the tape, or that he would not go to trial, such as would render the confession involuntary.[9]

Accordingly, Petitioner's Ground Three is **DENIED**.

### D. *Ground Four:*

The conviction was obtained in violation of Petitioner's right to counsel as guaranteed by the [S]ixth [A]mendment to the United States Constitution through the intervention of police officers in the administration

---

8. The AEDPA amended 28 U.S.C. § 2254(b) to allow a federal court to deny an application on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2)(West Supp.1998).

9. Indeed, even if the statements had been false or misleading, they do not necessarily render a confession involuntary. *See, e.g., Hawkins .v. Ly-*

*naugh,* 844 F.2d 1132, 1139 (5th Cir.1988) (confession would be voluntary even where police officer stated, as an expression of sympathy, that courts would be lenient); *United States v. Carter,* 910 F.2d 1524, 1529 (7th Cir.1990) (confession voluntary even though officer told defendant he did not know whether fiancee would be charged, when officer knew that fiancee would not be charged regardless of defendant's confession).

of *Miranda* warnings given by a magistrate.

Here, Petitioner argues that the evidence obtained after he invoked his right to counsel in front of the justice of the peace should have been suppressed. With respect to Petitioner's contentions, the Court of Criminal Appeals found on direct appeal that the following events occurred. After being extradited from Tennessee, accompanied by Officers Haralson and Kessler, Gribble voluntarily confessed to the murder of Elizabeth Jones after being warned of his *Miranda* rights. He then drew a map leading to the body and agreed to lead the officers to the location of the body and the purse. However, before allowing Gribble to lead the officers to the evidence, the officers took him before Harris County Justice of the Peace Boyd.

> Judge Boyd informed [Gribble] that he was under investigation for capital murder and again advised him of his rights, including his right "to have a reasonable time and opportunity to consult" with either retained or appointed counsel. [Gribble] indicated that he wished to have an attorney appointed; Judge Boyd noted this on the warnings sheet. [Gribble] appeared to be confused at this point. Responding to [Gribble's] apparent confusion, Ranger Haralson stated to Judge Boyd: "I believe that he [Gribble] misunderstood your question." Ranger Haralson testified that he spoke to clarify [Gribble's] intent regarding appointed counsel. Judge Boyd, either through routine practice or prompted by Haralson's statement—the record is unclear—inquired further into [Gribble's] desire for appointed counsel, explaining to him that a lawyer could be present within thirty minutes. [Gribble] responded that he did not need an attorney immediately, explaining that he wanted to proceed with what he "wanted to do," apparently meaning that he wanted to lead the police to the victim's body. Judge Boyd, realizing [Gribble's] response to be significant, asked him to sign his name to the warning sheet to indicate his desire to wait to have an attorney appointed after he did what he was "going to do." Upon leaving Judge Boyd, [Gribble] led the officers directly to where he had discarded the victim's purse

and then shortly thereafter to the victim's remains.

*Gribble v. State,* No. 71,485, slip op. at 5–6.

Once an accused has invoked his Sixth Amendment right to counsel, "the interrogation must cease until an attorney is present." *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1627; *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Any evidence obtained pursuant to interrogation after a subsequent waiver of the invoked right to counsel is inadmissible. *Edwards,* 451 U.S. at 487, 101 S.Ct. at 1886. In this case, however, the Court of Criminal Appeals found that Haralson's statement to Judge Boyd did not constitute "interrogation." In *Rhode Island v. Innis,* the Supreme Court held that interrogation occurs, and the Fifth Amendment is involved, when the "person in custody is subjected to either express questioning or its functional equivalent." 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). This Court agrees with the Court of Criminal Appeals' determination that "Haralson's comment, addressed to the magistrate, ... is not an 'interrogation' for purposes of the Fifth Amendment[ ]." *Gribble.v. State,* No. 71,485, slip op. at 7.

Moreover, even if Haralson's statement could be considered "interrogation," it appears that Gribble did not actually invoke his right to counsel, or that he limited that right by declining immediate representation, as the Court of Criminal Appeals found. Either way, Gribble's request was ambiguous. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (emphasis in original).

Ambiguity or equivocality in the invocation of the right to counsel is determined not solely by the words used in the request itself, but by those words taken in context, considering the circumstances leading up to

the request. *See Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) ("Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease."). Conflicting circumstances leading up to a facially unequivocal request for counsel could certainly cause ambiguity in the mind of a reasonable officer.

The record in this case reveals that the circumstances leading up to Gribble's affirmative response to Judge Boyd's question regarding counsel were such that a reasonable officer could have been confused as to Gribble's actual desires. Prior to being taken to the magistrate, Gribble had repeatedly been given *Miranda* warnings and consistently expressed his willingness to cooperate with police without an attorney. Furthermore, he had already admitted to the murder in a tape-recorded confession, drawn a map leading police to the remains of the body, and agreed to accompany officers to the location of the purse and body, all without requesting the assistance of counsel. It is eminently reasonable that Ranger Haralson could have been confused about Gribble's sudden change of mind, and that he would express that confusion in order to clear it up. If Gribble had unambiguously desired to have counsel present before cooperating further with police, that desire would have become evident when the magistrate allowed him to clear up the confusion regarding his request. However, at that time Gribble explicitly indicated, in writing, his desire to have an attorney for *subsequent* proceedings, but to waive his

right to counsel in the meantime so that he could do what he was "going to do."[10]

 The Court therefore affirms the state court's determination that Haralson's statement to Judge Boyd did not constitute interrogation, and that Gribble did not unambiguously invoke his right to counsel, but limited it by his subsequent statements.[11] Accordingly, Petitioner's Ground Four is **DENIED**.

### E. *Ground Five:*

The conviction was obtained in violation of the [E]ighth [A]mendment[12] to the United States Constitution as a result of the exclusion of a prospective juror who conceded that she had reservations about the death penalty which might affect her honest judgment of the facts and what she would deem to be a reasonable doubt, but who stated that she would honestly answer the questions put to her in the affirmative if she [were] convinced of that answer beyond a reasonable doubt.

 During voir dire in Petitioner's trial, the trial court granted the prosecution's challenge for cause of venire member Beverly Deaton, based on her answers to questions regarding the death penalty. Petitioner now challenges the constitutionality of the exclusion of Deaton from the jury.

 Under the Sixth Amendment, a prospective juror may be excused for cause if her views regarding capital punishment "would prevent or substantially impair the

10. At the time, Judge Boyd interpreted this to mean that Gribble wanted to first lead the officers to the remains of the victim and the evidence, and only wanted an attorney appointed after he had done so.

11. Moreover, even assuming that Gribble had unambiguously invoked his right to counsel, had not subsequently waived that right, and that Haralson's statement was interrogation, the Court finds that the evidence was still admissible under the "inevitable discovery" exception to the exclusionary rule. In *Nix v. Williams,* the Supreme Court held that "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." 467 U.S. 431, 447, 104

S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). In this case, prior to the asserted invocation of right to counsel, Gribble had already confessed the details of the crime, told officers where the body could be found, and had even drawn a map leading authorities to the body. Therefore, the evidence would undoubtedly have been discovered with or without Gribble physically leading the officers to the site, and falls under the "inevitable discovery" exception to the exclusionary rule.

12. Presumably, Petitioner intended to challenge the exclusion of the prospective juror on Sixth Amendment grounds, rather than Eighth Amendment grounds. The Sixth Amendment guarantees the right to a trial "by an impartial jury." U.S. Const amend. VI. The Eighth Amendment, on the other hand, contains the prohibition on cruel and unusual punishment. U.S. Const. amend. VIII.

performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *accord Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The determination as to whether or not a juror should be stricken for cause is a question of fact. *See Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984) (rejecting the circuit court's determination that it is a mixed question of law and fact). "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province," *Wainwright,* 469 U.S. at 428, 105 S.Ct. at 854, and therefore courts reviewing such findings on habeas review must accord them a presumption of correctness. *See id.; Patton,* 467 U.S. at 1037 n. 12, 1038, 104 S.Ct. at 2891 n. 12, 2892. Therefore, this Court must presume correct the trial court's decision to exclude Deaton, based on that court's own observations of Deaton's demeanor and credibility, unless Petitioner rebuts that decision with clear and convincing evidence.

The record reveals that several of the views expressed by Deaton justified the trial court to exclude her for cause. First, Deaton unequivocally expressed that she would hold the State to a higher burden than "beyond a reasonable doubt." At least ten times, Deaton affirmed that she would require the State to prove its case beyond *all* doubt, in any criminal case. Next, Deaton several times expressed apprehensions about serving on a criminal case of such magnitude. At one point she stated:

> I do not feel that I could do justice in this case. I don't want to make a decision. I don't want to have to make a decision whether he gets a death penalty or gets life.

SOF at 738. Later, Deaton exclaimed "Well, I can't, okay? I guess what it all boils down to, I couldn't do it [impose the death penalty]." *Id.* at 752. Then the following exchange between the trial court and Deaton took place:

> COURT: You are telling me regardless of what the evidence may show in the case, you just could not honestly answer the questions, [ ] that would result in the death penalty; is that correct?

DEATON: Yes.

*Id.* Deaton's answers regarding whether she could even find a defendant guilty of a capital crime are remarkably ambiguous and contradictory. Further into the voir dire by the prosecution, Deaton again confirmed that she would hold the State to a higher burden than beyond a reasonable doubt, that she could not impose the death penalty, and that she could not "do justice to her oath."

When further questioned by the defense attorney, Deaton stated "I couldn't be responsible for somebody's death. It's just not right," *id.* at 760, and "I wouldn't want to sit in judgment of anyone." *Id.* at 762. After further exchanges, the defense attorney then asked her "[b]ut could you answer [the special issues] honestly?" to which Deaton replied "[y]es, I would answer honestly." *Id.* On this basis alone, despite her prior repeated assertions that she could not answer honestly and could not sit on a jury in a capital trial and impose the death penalty, Petitioner argues that Deaton was improperly excluded.

The Court finds that the evidence supports the trial court's decision that Deaton's exclusion for cause was proper, and did not violate Gribble's constitutional rights. Giving Petitioner the benefit of the doubt, the record indicates at the very least that Deaton vacillated as to whether she could faithfully perform her legal duty as a juror. As stated in *Wainwright:*

> Despite this lack of clarity [regarding a prospective juror's bias] in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Wainwright,* 469 U.S. at 425–26, 105 S.Ct. at 852–53. Petitioner has presented no evidence to rebut this presumption of correctness.

Accordingly, Petitioner's Ground Five is **DENIED.**

## F. *Ground Six:*

The conviction was obtained in violation of the Petitioner's rights under the [E]ighth and [F]ourteenth Amendments to the United States Constitution because of jury argument made by the state court prosecutor which created an unacceptable risk of the imposition of the death penalty for reasons other than those authorized by State law and/or permitted by the United States Constitution.

 In final argument to the jury during the state trial, the prosecutor made the following arguments in relation to the second special issue:

Second special issue, again, probability he would commit continuing acts of violence and be a future threat to society, again very strong. And I think we proved those not beyond a reasonable doubt, but beyond any doubt.... When you answer that, I think you take in consideration conduct in the penitentiary but I think you also take in consideration conduct that the Defendant may have on the street in the community as a whole when you answer that special issue.

Petitioner contends that this argument improperly placed before the jury, in answering the special issues, the meaning of a life sentence, by asking the jury to consider what Gribble's future conduct on the street would be.[13]

Petitioner submits no authority to establish that the state prosecutor's argument infringed upon his Eighth and Fourteenth Amendment rights. In fact, according to Respondent, had Gribble received a life sentence for his crime, he would have been eligible for parole in twenty years. *See* Tex. Code Crim. Proc. Ann. art. 42.18 § 8(b) (Vernon 1985) (repealed 1997). Therefore, the prosecutor's argument was not false or misleading. The Supreme Court has stated that "nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release." *See Simmons v. South Carolina,* 512 U.S. 154, 168, 114 S.Ct. 2187, 2196, 129 L.Ed.2d 133 (1994) (plurality opinion).

 Moreover, in *Simmons,* the Supreme Court affirmed that "[t]he decision whether or not to inform the jury of the possibility of early release is generally left to the States." *Id.* at 176, 114 S.Ct. at 2200 (O'Connor, J., concurring) (citing *California v. Ramos,* 463 U.S. 992, 1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983)). In this case, the Texas Court of Criminal Appeals held on direct appeal that "[t]he possibilities of escape or some other release from prison are legitimate concerns in determining the future dangerousness of a defendant." *Gribble v. State,* No. 71,485, slip op. at 14 (citing *Sawyers v. State,* 724 S.W.2d 24, 37 (Tex.Crim. App.1986)).[14] This determination of law by the state court was not contrary to "clearly established precedent." Therefore, the Court finds that the state prosecutor's argument did not infringe upon any of Petitioner's constitutional rights.

Furthermore, although constitutional law does require that a defendant be given the opportunity to rebut or explain *misleading* information regarding his eligibility for parole, *see Simmons,* 512 U.S. at 168–69, 114 S.Ct. at 2196, Petitioner does not claim that he was not given the opportunity to explain the state prosecutor's argument, or that the argument was misleading. Indeed, at Petitioner's request, the jury was instructed:

With regard to the effect of your answers to the Special Issues in this case you are not to discuss or consider any possible actions of the Governor or the Pardons and Paroles Division of the Texas Department of Criminal Justice. During your deliberations in this case, you must not consider, discuss, or relate any matters not in evidence before you.

Court will analyze Ground Six on its substantive merits.

---

**13.** Respondent contends that this claim was not exhausted in the state appeals process and is therefore procedurally barred. However, it appears that Petitioner did challenge the proper scope of jury argument under state law. Giving Petitioner the benefit of the doubt, and exercising its discretion under 28 U.S.C. § 2254(b)(2), the

**14.** *Sawyers* has been overruled on other grounds by *Watson v. State,* 762 S.W.2d 591, 599 (Tex. Crim.App.1988).

Therefore, any conceivably improper argument by the state prosecutor was cured by the trial court's instruction to the jury.

Accordingly, Petitioner's Ground Six is **DENIED**.

G. *Ground Seven:*

> The penalty of death was obtained in violation of due process of law under the [F]ourteenth [A]mendment to the United States Constitution because the State's evidence of the aggravating circumstance required by state law, the Petitioner's guilt of kidnaping, was not established by constitutionally sufficient evidence.

■■■ Petitioner argues in his Seventh Ground for relief that there was insufficient evidence to support the finding that a kidnapping had occurred because there was no evidence independent from his own confession. The state courts concluded on state habeas corpus review that these claims were meritless. On federal habeas corpus review of a state court conviction under 28 U.S.C. § 2254, this Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 324, 99 S.Ct. 2781, 2789, 2791–92, 61 L.Ed.2d 560 (1979) (emphasis in original).

Viewing the evidence in the light most favorable to the prosecution, the Court is convinced that a rational trier of fact could have found proof beyond a reasonable doubt that Gribble kidnapped Elizabeth Jones. According to his own statements to the police, Gribble entered Jones's house under false pretenses and sexually assaulted her. Then, after she told him that she was going to report him to the police, Gribble forced Jones into his truck and forced her to lay her head in his lap so that nobody would see her. He then drove Jones around for over an hour before coming to a secluded area, where he strangled her and left her dead. This evidence is clearly sufficient to find that Gribble murdered Jones in the course of kidnapping or attempting to kidnap her.

Petitioner seems to argue that his confession taken alone is an insufficient basis upon which to find that he kidnapped Jones. This state rule of independent evidence, or *corpus delecti,* "has no independent constitutional footing." *Autry v. Estelle,* 706 F.2d 1394, 1407 (5th Cir.1983) (rejecting a Texas petitioner's state *corpus delecti* argument that his statements to his mother were insufficient to find evidence of a robbery); *accord Lucas v. Johnson,* 132 F.3d 1069, 1078 (5th Cir.1998); *see also Llewellyn v. Stynchcombe,* 609 F.2d 194, 196 (5th Cir.1980) (Georgia rule requiring independent corroboration not controlling upon collateral review by a federal court). This Court's conclusion that the evidence is constitutionally sufficient under the *Jackson* standard therefore ends the inquiry.

Accordingly, Petitioner's Ground Seven is **DENIED**.

H. *Ground Eight:*

> The conviction was obtained in violation of due process of law under the [F]ourteenth [A]mendment to the United States Constitution because the Petitioner's guilt of causing the death of the victim intentionally or deliberately was not established by constitutionally sufficient evidence.

■■■ Petitioner's eighth ground for relief involves a two-fold claim that the evidence was insufficient to show intent and/or deliberateness. The jury's finding that Gribble intentionally caused Jones's death occurred at the guilt-innocence phase of the capital murder trial, while the finding of deliberateness occurred in the punishment phase, where the jury considered the two special issues that warrant the death penalty. Respondent first argues that Petitioner did not raise, either in the state appeals process or in state collateral habeas review, the constitutional sufficiency argument regarding the jury's punishment-phase finding that Gribble acted deliberately, and that therefore such claim is procedurally barred. Once again, although Petitioner did fail to exhaust the deliberateness claim in the state proceedings, the Court will nevertheless review the merits of the claim in an abundance of caution.

Petitioner did exhaust in state proceedings his argument challenging the constitutional sufficiency of the evidence supporting the jury's guilt-innocence phase finding of inten-

tional conduct. With respect to this claim, the state courts concluded that the evidence was sufficient to establish that Gribble acted intentionally. Once again, on federal habeas review of a challenge to the sufficiency of the evidence, this Court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). The Court of Criminal Appeals applied this standard on direct appeal of Gribble's conviction and sentence, and determined that, based on the established facts, Petitioner

> employed one of the most laborious and time consuming methods of murder, strangulation, which required him to choke his victim for several minutes even after she had lost consciousness.[15] This evidence is sufficient to support a reasonable factfinder's conclusion that [Gribble] intentionally killed the victim.

*Gribble v. State*, No. 71,485, slip op. at 2. This Court agrees that the evidence is sufficient to show intent to commit murder. Moreover, the same evidence is more than sufficient for a rational factfinder to have found that the murder was committed intentionally *and* deliberately, considering the "laborious and time consuming" method of strangulation that Gribble used to kill the victim. *See Heiselbetz v. State*, 906 S.W.2d 500 (Tex. Crim.App.1995) ("[T]he act of killing a human being by strangulation reasonably supports a conclusion that a killer acted deliberately . . . ."); *Chambers v. State*, 866 S.W.2d 9, 16 (Tex.Crim.App.1993) (where accused took victim into secluded wood, bound her, and choked her for several minutes until she died, evidence supported finding that accused acted deliberately), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994).

Accordingly, Petitioner's Ground Eight is **DENIED**.

### I. *Ground Nine:*

> The conviction was obtained in violation of Petitioner's rights under the [E]ighth and [F]ourteenth [A]mendment[s] to the United States Constitution because the jury was not instructed with sufficient clarity to give the jury an opportunity to express a reasoned moral response to the evidence offered in mitigation of the sentence of death.

In his ninth point of error, Petitioner challenges the "nullification charge" given to the jury in his second trial. The trial court, in fulfilling its constitutional obligation to ensure that the jury be given an opportunity to express a reasoned moral response to the mitigating evidence and impose a life sentence rather than death, *see Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), instructed the jury as follows:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented in both phases of the trial. Mitigating circumstances may include, but are not limited to, any aspects of the defendant's background, character, record, or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances you must decide how much weight they deserve, if any; and give them the consideration and effect they deserve, if any, when you answer the Special Issues.
>
> If you determine, in consideration of this mitigating evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "no." If you have made such a determination, an answer of "no" should be given independently of whether such mitigating evidence is relevant to either Special Issue, and regardless of what you find the answers to the Special Issues to be.

Tr. 110–111. Petitioner argues that this instruction was "the most cumbersome, ambiguous and inherently confusing vehicle" to the trial court for satisfying its constitutional duty to allow the jury to impose life rather than death. Petitioner believes that the nul-

---

15. At trial, the medical examiner testified that strangulation requires choking for several minutes until the victim loses consciousness, and for several more minutes until the victim dies.

lification charge was constitutionally deficient because it spared the jury the direct responsibility for imposing death, instead limiting the jury's consideration to specific yes or no responses.

Respondent once again argues that Petitioner failed to exhaust this claim in the state courts, and that therefore the claim is barred from this Court's consideration. This Court will again exercise its discretion under 28 U.S.C. § 2254(b)(2) to review Ground Nine on its merits despite Petitioner's failure to exhaust it in the state courts.

As previously stated, Gribble's punishment of death was assessed after the jury answered in the affirmative the two special issues required by TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (Vernon 1991). *See supra* note 2. Petitioner has not presented any case authority to support his contention that allowing the jury to nullify its otherwise affirmative answer to one of the special issues is not an appropriate vehicle for allowing the jury's reasoned moral response to the mitigating evidence. In fact, in order to grant Petitioner the relief he requests in his ninth point of error, the Court would have to announce and apply a new rule of constitutional law, a course of action prohibited on federal habeas review. *See Teague v. Lane,* 489 U.S. 288, 305–08, 109 S.Ct. 1060, 1073–74, 103 L.Ed.2d 334 (1989).

The nullification charge has been upheld in Texas as a constitutional method of satisfying the mandate of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), that a jury be empowered to express a reasoned moral response to mitigating evidence in capital cases. *See, e.g., Wheatfall v. State,* 882 S.W.2d 829, 841 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995); *Robertson v. State,* 871 S.W.2d 701, 710 (Tex.Crim.App.1993), *cert. denied,* 513 U.S. 853, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994); *Fuller v. State,* 829 S.W.2d 191, 209 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). The nullification charge satisfies the constitutional defect identified by *Penry* as long as it allows the relevant mitigating evidence to be placed within "the effective reach of the sentencer." *See Johnson v. Texas,* 509 U.S. 350, 368, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993).

In this case, the trial court's charge was comprehensive and explicit in its instructions to the jury that the jury could consider any mitigating circumstances supported by the evidence and impose a life sentence rather than death, regardless of its answers to the special issues. The Court finds that this instruction satisfies the constitutional requirements imposed in capital punishment cases because it clearly and unequivocally places the option of mitigating a death sentence within the effective reach of the jury. Accordingly, Petitioner's Ground Nine is **DENIED.**

## V. CONCLUSION

Based on the foregoing analysis and findings, the Court has concluded that Petitioner has failed to show that he is entitled to federal habeas corpus relief. Accordingly, Petitioner's Petition for Writ of Habeas Corpus is **DENIED,** and Respondent's Motion for Summary Judgment is correspondingly **GRANTED.** All of Petitioner's claims are **DISMISSED WITH PREJUDICE.** Moreover, the Stay of Execution granted by this Court on April 13, 1998 is hereby **VACATED.** The parties are **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider or the like, unless justified by a *compelling* showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**